## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>MAVENIR, INC. F/K/A XURA, INC.,  PHILIPPE TARTAVULL,  HENRY R. NOTHHAFT, SUSAN D. BOWICK, JAMES BUDGE, NICCOLO DE MASI, MATTHEW A. DRAPKIN, DORON INBAR, and MARK C. TERRELL,<br><br>     Defendants. | Civ. A. No. _____<br><br><u>CLASS ACTION</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Wayne County Employees' Retirement System, by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, inter alia, the investigation of counsel, and the review of publicly-available information, including publicly available evidence in *Obsidian Management LLC v. Xura, Inc.*, No. 12698-VCS (Del. Ch.) (the "Appraisal Action").

## NATURE OF THE ACTION

1. This class action arises from a transaction announced on May 23, 2016 (the "Merger"), pursuant to which Xura, Inc. ("Xura") was acquired by Sierra Private Holdings II Ltd. ("Parent") through its wholly-owned subsidiary, Sierra Private Merger Sub Inc. ("Merger Sub"), both of which are affiliates of Siris Capital Group, LLC (together with Parent and Merger Sub, "Siris").

2.       The action is brought on behalf of all Xura shareholders of record as of July 11, 2016, the record date for Xura shareholders to be eligible to vote on the Merger. The claims asserted herein are alleged against Xura, Xura's former President and Chief Executive Officer ("CEO"), as well as a director, Philippe Tartavull ("Tartavull"), and the remaining members of Xura's Board of Directors (together with Tartavull, the "Individual Defendants") (collectively, "Defendants") for their violations of Sections 14(a) and/or 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder.

3.       On May 23, 2016, Xura's Board of Directors (the "Board" or "Individual Defendants") caused Xura to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, stockholders of Xura received $25.00 per share in cash.  The Merger was approved by a shareholder vote on August 16, 2016 and closed on August 19, 2016.

4.       Prior the shareholder vote, Defendants issued a Preliminary Proxy Statement on June 28, 2016, a Final Proxy Statement on July 12, 2016 (together, the "Proxy"), and on July 26, 2016, a supplemental Proxy Statement (the "Supplemental Proxy Statement"), all filed with the United States Securities and Exchange Commission ("SEC") in connection with the Merger. The Proxy and Supplemental Proxy contained materially incomplete and misleading disclosures. The Proxy and Supplemental Proxy are deficient and misleading in that they fail to provide adequate disclosure of all material information related to the Merger.

5.       In particular, the Proxy failed to disclose:  (a) material communications between Tartavull and Siris, including ones in which Tartavull discussed certain merger terms without authorization by the Board or the Board subcommittee that had been formally provided with

extensive authority with respect to consideration of the Merger, the Strategic Committee, and undermined Xura's negotiating leverage, (b) the fact that the Strategic Committee played no meaningful role in the process that led to the Merger, contrary to the representations in the Proxy, (c) the fact that Siris and Tartavull repeatedly cut the Board's financial advisor, Goldman Sachs ("Goldman"), out of the loop of the Merger negotiations, notwithstanding the role the Proxy claimed Goldman played in that process, (d) the fact that Xura imposed conditions on an interested bidder that all relevant participants in the process acting on behalf of the Company knew were unreasonable and unnecessary, leading it to further participation in the bidding, and (e) the fact that, while the Proxy emphasized purported contacts to prospective buyers and claimed that none expressed an interest in buying Xura, another potential bidder had in fact expressed such interest to Tartavull but somehow learned that Siris was Xura's counterparty, notwithstanding provisions of the non-disclosure agreement signed by Siris and Xura barring such disclosure, and instead of making a bid reached out to Siris seeking a role as a co-investor.

6.      The Supplemental Proxy emphasized that Xura and Siris had "not reached any agreements about the continuing employment of the executive officers of the Company".  This was a misleading representation as regardless of whether there had been any formal negotiations as to Tartavull's employment after the Merger, it was always clear that Siris' intent had been for Tartavull to continue in his role as CEO of the post-merger company.

7.      As a result of these material misrepresentations and omissions, Xura shareholders were misled into accepting consideration from the Merger that was well below fair value for their Xura shares.

8.      Accordingly, Plaintiff alleges herein that Defendants violated Sections 14(a) and 20(a) of the Exchange Act by filing false and misleading proxy materials.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange

Act, 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17

C.F.R. § 240.14a-9. This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. § 1391(b). Prior to the Merger, Xura was incorporated in this District and the merged

entity, which operated under the same name,  continued to maintain its incorporation in this

District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly,

used the means and instrumentalities of interstate commerce, including, but not limited to, the

mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.      Plaintiff Wayne County Employees' Retirement System owned shares of Xura

stock eligible to vote on the Merger and suffered damages as a result of the violations of the

federal securities laws alleged herein.

12.      Defendant Xura was at all relevant times a Delaware corporation that maintained

its principal executive offices in Wakefield, Massachusetts. Xura's common stock was traded on

the NasdaqGM under the ticker symbol "MESG." After the Merger, Xura was privately owned

and operated. In December 2016, Xura announced that it had entered into definitive agreements

to acquire Mitel Mobility, Inc. and Ranzure Networks, Inc.  Upon the completion of both

acquisitions, by March 2017,  the new combined company was re-named Mavenir Systems, Inc.

13.      Defendant Tartavull served as a director, President, and CEO of Xura starting in

May 2012, and continued in the role of CEO of Xura after the Merger until December 19, 2016.

Tartavull also served as a member of the Strategic Committee

14.     Defendant Henry R. Nothhaft ("Nothhaft") was a director of Xura and served as Chairman of the Board starting in October 2012. According to the Company's website, Nothhaft was Chair of the Corporate Governance and Nominating Committee. Nothhaft also served as a member of the Strategic Committee.

15.     Defendant Susan D. Bowick ("Bowick") served as a director of Xura starting in October 2012. According to the Company's website, Bowick was  Chair of the Compensation and Leadership Committee and a member of the Corporate Governance and Nominating Committee.

16.     Defendant James Budge ("Budge") served as a director of Xura starting in October 2012. According to the Company's website, Budge was a member of the Audit Committee and the Compensation and Leadership Committee.

17.     Defendant Niccolo de Masi ("de Masi") was a director of Xura. According to the Company's website, de Masi was a member of the Audit Committee and the Corporate Governance and Nominating Committee.

18.     Defendant Matthew A. Drapkin ("Drapkin") was a director of Xura. According to the Company's website, Drapkin was a member of the Compensation and Leadership Committee. Drabkin also served as a member of the Strategic Committee.

19.     Defendant Doron Inbar ("Inbar") served as a director of Xura starting in October 2012. According to the Company's website, Inbar was a member of the Audit Committee and the Corporate Governance and Nominating Committee.

20.     Defendant Mark C. Terrell ("Terrell") served as a director of Xura starting in October 2012. According to the Company's website, Terrell was Chair of the Audit Committee and a member of the Compensation and Leadership Committee.

## SUBSTANTIVE ALLEGATIONS

**Background of the Merger**

21.    At all relevant times, Xura offered a portfolio of products and services to major telecommunications companies, digital communications services for businesses, and products that facilitated additional revenues for mobile carriers.

22.    Siris is a private equity fund that focuses on technology companies, particularly those in the telecommunications industry, that the market fails to accurately value by reason of the complex nature of their businesses.

23.    From October 2013 through 2014, Tartavull had a series of discussions with senior Siris personnel regarding potential strategic transactions, one of which resulted in a January 7, 2015 Siris indication of interest in acquiring Xura for a price of $24 per share.

24.    At the time, Xura was also considering a proposal by Amdocs Limited ("Amdocs") and another bidder to purchase the Company's billing systems and support business ("BSS Business").  The Board retained Goldman at that time to act as its investment banking advisor in consideration of these transactions.

25.    In February 2015, after certain due diligence that Siris had engaged in, it reduced its offer to a range of $20 to $22 per share.  On February 11, 2015, the Board rejected this proposal in light of, among other things, its determination that the sale of the BSS Business would increase Xura's enterprise and market valuation.

26.    As the year continued, Xura had become even more attractive to Siris, developing into precisely the type of complex business that the market tended to undervalue.  In addition to the sale of the BSS Business to Amdocs, which closed in July 2017, the Company finalized on April 14, 2015 an agreement to enter into a global strategic partnership with Tech Mahindra, which specializes in digital transformation, consulting, and business re-engineering in the global

technology industry.  Also, on August 6, 2015, Xura acquired Acision Limited, which specializes in secure mobile messaging and engagement services.

27.     In certain of its later offer letters to Xura, Siris stated that its interest in the Company stemmed from the fact that "in our experience, public equity markets typically do not understand long-term, complex business transformations and remain focused on short-term performance".  Further, to potential lenders, Siris stated that Xura was "Misunderstood by Public Markets", "unappreciated", and that "transformational transactions and associated significant restructuring masks attractive financial profile".

28.     Consistent with that view, Goldman recognized that the transformational transactions that Xura had engaged in would likely leave Siris with little competition because, as Goldman's Co-Chief Operating Officer of the Global Technology, Media and Telecom Group commented, the "[s]imultaneous closing of a massive divestiture  and a reverse merger is pretty much unprecedented".  As such, the complexity of the Company would make it more difficult to understand and more difficult for a buyer to "arrange institutional debt", as "the ability to make sense of a stable set of financials will be quite challenged".

29.     On October 19, 2015, Siris submitted an indication of interest to acquire the Company at a price of $30.00 to $32.50 per share.  It did so by means of a letter to Tartavull that stated in part that Siris was "excited about the prospect of working with the management team to help Xura reach its full potential", clearly reflecting an understanding that Tartavull and his management team would be retained in the event the Merger occurred.

30.     On October 22, 2015, the Board met and determined to reject Siris' proposal. Undeterred, on October 29, 2016, Siris sent to Tartavull another letter, increasing its offer to $35 per share, and repeating the same statement about an eagerness to work with "the Company and

its leadership team to accelerate Xura's transformation without the scrutiny and pressures of the public markets". The same statement was repeated in a December 2, 2015 letter Siris sent to reaffirm its $35 per share offer.

31.     On November 5, 2015, the Board again retained Goldman as the Company's financial advisor, authorizing it to continue discussions with Siris.  On November 19, 2015, Daniel Krinsky ("Krinsky") of Goldman asked Michael Huslander ("Hulslander"), Siris' Vice Principal handling day-to-day management of the negotiation process, to "please keep me on any communications with the Company going forward".

32.     Siris consciously ignored this request.  Indeed, on November 29, 2015, Hulslander told Frank Baker ("Baker"), a managing partner at Siris, that he wanted to "make sure we have a non-Goldman game of telephone game plan to get the remaining high priority data".

33.     On December 3, 2015, the Board established a Strategic Committee comprised of Individual Defendants Tartavull, Nothhaft, and Drapkin.  According to the Proxy, the Strategic Committee was created to "review, evaluate and negotiate the terms of a potential transaction with Siris and to make certain decisions between meetings of the board of directors."  In fact, however, the Strategic Committee was not meaningfully involved in the process that led to the Merger. The Strategic Committee never met with Siris, never took formal action and never kept minutes. Nothhaft described it in his testimony in the Appraisal Action as "a weekly, or more, phone call with Philippe... [where] we would discuss... the most important and difficult issues that he was confronting as a CEO."  Indeed, Nothhaft did not even realize that it was a board committee. Neither of the nominally "independent" Committee members had any idea how often management and Siris spoke or what they discussed.

34.     The Board permitted Tartavull to have a lead role in negotiations with Siris even though it was well known within the market that Siris "typically keep[s] management teams in place." Further, Nothhaft's testimony in the Appraisal Action revealed that Tartavull knew that, absent a deal, the Board would likely replace him.

35.     Tartavull was an active and conscious participant with Siris in creating a "non-Goldman game" of communication, including by means of telephone, emails, texts as well as physical meetings. Tartavull began exchanging texts with Baker no later than October 21, 2015, two days after Siris expressed interest in acquiring Xura. Texts between Tartavull and Baker and other Siris personnel continued until long after the closing of the Merger.

36.     Beginning in January 2016, Xura and Siris held a series of due diligence sessions, during which Xura provided Siris with access to a due diligence room. Also during this period, Tartavull and Siris repeatedly cut Goldman out of the loop. The Proxy notes that Tartavull and Baker "discussed the status of Siris' due diligence review and the timeline for announcing a transaction" on January 7, 2016. But they do not mention a number of other conversations between Tartavull and Siris around the same time.

37.     Tartavull and Baker spoke on January 25, 2016. Goldman did not know about the conversation until Xura's CFO, Jacky Wu, reported it to its relevant personnel. A multitude of other communications occurred as well. Siris even sent certain of its analyses directly to Tartavull. The side communications alarmed Wu, who informed Goldman that "[Tartavull] had talk with frank" and asked Goldman to speak with Tartavull.

38.     Direct, unsupervised communications between Siris and Tartavull continued despite Goldman's requests that they are included on all communications between Xura and Siris. Krinsky testified in the Appraisal Action that Goldman should have been "the point for

communication between bidders."  He further testified that "when we run processes, we like all communications to go through us versus anybody going directly to the company." At his deposition, Hulslander admitted that Siris ignored repeated requests that Siris channel communications through Goldman. When asked about Tartavull's texts with Siris, Krinsky testified that  "we don't view that as the appropriate way to communicate."

39.     On January 27, 2016, Goldman Sachs reached out to several potential bidders, and four executed non-disclosure agreements.  However, Hulslander acknowledged that Siris' contacts with Tartavull gave it a "head start" compared to other participants in the process. In contemporaneous emails, Hulslander boasted that Siris had a "proprietary angle" on the deal and that Xura was "not for sale."

40.     On February 25, 2016, Siris submitted a revised indication of interest to acquire the Company for $28.00 per share.  However, the Proxy completely omits a meeting between Baker and Tartavull the day before that resulted in this revised offer, one that contradicted the Proxy's representations leading to the impression that Goldman led all the Company's price negotiations with Siris. At this meeting on February 24, 2015, Baker and Tartavull discussed the price of Siris' offer, timing of the transaction, and possible M&A transactions. Tartavull told Baker that Siris should offer $28 per share. As noted,  Siris did so one day later. Baker later wrote that the parties had "agreed" upon $28 before Siris sent the letter.  Neither the Board nor Goldman was informed of this meeting.

41.     There were other highly sensitive communications between Tartavull and Siris that were omitted from mention in the Proxy and apparently never disclosed to the Board or Goldman. For example, in March 2016, Tartavull told Siris that Wu, Xura's CFO,  told "white lies", clearly undermining Xura's negotiation position. He suggested that Siris bring in someone

to take over the CFO's responsibilities during the transaction process. The discussion prompted Baker to direct his team to "triple check" Xura's numbers.

42.     On March 5, 2016, Tartavull and Siris arranged a call to discuss high priority diligence items without notifying Goldman.  On the same day, Baker criticized Siris personnel for failing to send a data request list to Tartavull because, he revealingly stated,  "Philippe is part of working team. He needs to be in mix[.]".  In late March 2016, Wu commented that Tartavull "appears to be working directly with Siris on his own."

43.     On March 13, 2016, a potential buyer, The Carlyle Group ("Carlyle"), referred to in the Proxy as "Party B",  provided Goldman Sachs with an indication of interest in the range of $26.00 to $27.00 per share, but said that it "still [had] a lot of work to do to confirm", given that, as Goldman noted with respect to the amount of due diligence that was required by Carlyle and other bidders, Xura was "a complicated story".  Nonetheless, instructed by the Company, Goldman told Carlyle that it would need to bid $28 per share or higher and that any remaining due diligence it was engaged in would "need to be completed on an expedited time frame".  This communication was made despite the fact, which was not disclosed in the Proxy, that various participants in the negotiation process for  Xura fully expected that Siris would likely reduce its latest bid to below that target price.

44.     Nothhaft admitted at his deposition in the Appraisal Action that he was skeptical of Siris' offers. Tartavull testified that he knew that Siris would likely try to lower its price because that was the "track record of every private equity [firm]." Wu testified that "[g]iven the nature of private equity and how they do business . . . it's a common tactic that they try to re-trade numbers." Further, Siris had previously lowered its bids for Xura.

45.     Upon receipt of Goldman's communication, Carlyle stated that "it would not move forward in the bidding process". Thus, Xura effectively, and purposelessly, eliminated the only viable competitor to Siris in the bidding process.

46.     Thereafter, on March 16, 2016, lacking at that time any such competitor, Xura entered into an exclusivity agreement with Siris that would prevent Xura or its advisors from soliciting or encouraging offers from anyone except Siris through April 8. At the end of that period, exclusivity would automatically renew unless Siris or Xura terminated it.

47.     During the exclusivity period, Tartavull and Siris continued to cut out Goldman from the negotiation process. When Goldman acted as an information conduit, Tartavull reacted by demanding that he be copied on every request from Siris. However, the same courtesy was not provided to Goldman, resulting in its being in the dark as to material relevant facts before Siris learned of them. For example, Siris learned information from Tartavull about a claim against the escrow account established in connection with the sale of the BSS Business to Amdocs, as well as the resulting effects on the Company's projected cash at closing, before Goldman came into possession of those facts. When Siris complained to Jason Rowe ("Rowe") of Goldman about this development, Rowe had to ask his team about it. Krinsky responded that it was the "first time I am hearing [it] and [it] would obviously be a significant issue." Michael Ronen ("Ronen") of Goldman concluded: "[h]ere comes the price renegotiation ... [w]e are in exclusivity and now [S]iris will create a crisis to take price down."

48.     Certain personnel at Goldman, including Krinsky, concluded that Siris may have learned the new information when Tartavull, Baker and Hubert de Pesquidoux ("de Pesquidoux"), a Siris Executive Partner, had dinner on March 23, 2016, an event that was never disclosed in the Proxy and that did not include Goldman. Krinsky "question[ed] communicating

such info in that forum.". This and other instances involving information first learned by Siris before being presented to Goldman prompted Rowe to tell Baker he could not "say one thing to me and another to [Tartavull]."

49.     On March 24, 2016, Siris told Goldman it might not be able to offer more than $24 per share. Ronen concluded in an email that  "[t]his is a classic case of post exclusivity price retrade. The more !!!!!!! I see in Frank's email the more obvious it is[.]"

50.     On April 7, 2016, Goldman and Xura determined upon a negotiation tactic in reaction to Siris' repeated efforts to direct the negotiations backward in terms of price. They decided to shut down communications with Siris and go "radio silent".  However,  hours later, Tartavull simply ignored this strategy by communicating directly with Siris. Wu reacted in an email to this turn of events by stating "[w]e are bidding against ourselves." At his deposition, Wu testified that he believed at the time that Tartavull's contacts with Siris "undermined the company's negotiating position."

51.     On April 9, 2016, Siris formally submitted an indication of interest to acquire Xura for $24.75 per share. Xura capitulated to Siris' re-trading its prior higher bid,  requested that Siris raise its offer price to only $25.00 per share, and the parties came to an agreement at that price.

52.     On April 15, 2016, Xura publicly announced that it was unable to timely file its 2015 Form 10-K and that it was in negotiations to sell itself for $25 per share, without mentioning the name of its counterparty. In the release, Xura blamed its financial reporting problems on the "complex strategic negotiations for the potential sale of the company."

53.     Thereafter, Francisco Partners, a private equity firm focused exclusively on investments in "technology and technology-enabled services businesses", expressed an interest

in competing with the unnamed third party to acquire Xura. Francisco Partners had previously invested in Hypercom, where Tartavull served as CEO before he joined Xura. Keith Geeslin, a partner at Francisco Partners, told Tartavull that "if Xura is going to be sold, FP would appreciate the opportunity to bid."

54.     This indication of interest was nowhere mentioned in the Proxy. As such, the Proxy further does not explain why Francisco Partners ended up not making a bid for Xura. Instead of doing so, it somehow learned that Siris was Xura's counterparty, notwithstanding the mutual non-disclosure agreement signed by Xura and Siris barring such disclosure. Instead of submitting a competing proposal, Francisco Partners reached out to Siris about a potential co-investment on the buy-side of the transaction. Xura eventually approved of Francisco Partners as a financing source, though later Siris and Francisco Partners failed to agree upon the terms of a co-investment agreement.

55.     In May 2016, Tartavull sought to completely exclude Goldman from the process, telling its representatives that he was already communicating with Siris and did not want "two lines of communication".

56.     On May 22, 2016, the Board approved the Proposed Transaction with Siris, and the Merger Agreement was executed the following day, on May 23, and thereafter announced to the press that day.

57.     Pursuant to the Merger Agreement, there followed a forty-five day go-shop period, a length of time that failed to account for the difficulties competing bidders would likely have in navigating the complexities of Xura's business, one in the midst of transformation.  As Baker acknowledged, "Xura was a super complicated business". Goldman reported that Marlin Equity Partners and Vector Capital had declined to participate because of the "complicated

history of the asset, current performance and the potential break fees". Further, as noted, a potential bidder, Francisco Partners had already been sidelined, presaging the reaction of other bidders once Siris' identity as the successful bidder became known. As Tartavull admitted in his testimony, "since Siris was engaged, I don't think they want to go to battle seriously in a go-shop."

**Defendants' Materially False And Misleading Statements**

58.     On June 28, 2016, Xura filed a definitive proxy, including the merger agreement, with the SEC on Form DEFM14A, and mailed it to shareholders. On July 12, 2016, it did the same with a final version of that definitive proxy, which repeated the same representations relevant to the claims herein (together, both documents have been and are referred to herein as the "Proxy")

59.     The Proxy disclosed certain communications between Tartavull and Siris but failed to disclose numerous other, material ones. Most notably, the Proxy lacked any reference to the February 24 meeting in which Tartavull and Siris discussed the transaction price, deal timing, and potential acquisitions. Further, the Proxy failed to disclose instances in which Tartavull directly undermined the negotiating strategy agreed to by Goldman and the Board.

60.     The Proxy disclosed certain communications that Goldman had with Siris, including those relating to price terms, such as on February 18, 2016, and on March 24, 2016, as well as on other Merger issues on other dates, leading to a false impression that it was Siris' prime negotiating partner. These disclosures were false and misleading because of the failure to disclose the numerous discussions that Tartavull had with Siris, including those in which Siris often learned of facts material to the negotiations before Goldman, the efforts by both Tartavull and Siris to exclude Goldman, and Goldman's acknowledgment that these communications and efforts were improper.

61.     According to the Proxy, the Strategic Committee was created to "review, evaluate and negotiate the terms of a potential transaction with Siris and to make certain decisions between meetings of the board of directors."  There are also references in the Proxy to Tartavull having discussions with the Strategic Committee as to Siris' proposals.  These disclosures were misleading and incomplete as the Strategic Committee played no meaningful role in the process that led to the Merger.

62.     The Proxy disclosed Carlyle's (referred to as Party B) indication of interest, at a range of $26-27 per share, subject to more due diligence, the response that Goldman provided to Carlyle at the Company's instruction, including Xura's insistence that it makes a bid at $28 per share or higher and do so promptly, and Carlyle's resulting departure from the bidding process. These disclosures painted a misleading picture of the reasonableness of Xura's response to this competing bid given the omission from the Proxy of the views by various Xura participants that Siris would likely bid below $28 per share and that Xura was a "super complicated business" requiring additional time to understand.

63.     Xura's disclosures never mentioned Francisco Partners. Instead, the Proxy emphasized that Xura contacted "26 prospective buyers" and that "[n]one of the parties contacted during the go-shop process . . . submitted an Acquisition Proposal to the Company." Thus, the Proxy failed to disclose that one of the parties contacted refused to participate in the go-shop because it was seeking to co-invest with Siris, or that Xura ultimately approved that possible co-investment.

64.     On July 26, 2016, Xura filed with the SEC the Supplemental Proxy on Form DEFM14A, and mailed it to shareholders.

65.     The Supplemental Proxy emphasized that Xura and Siris had "not reached any agreements about the continuing employment of the executive officers of the Company".  This was misleading as regardless of whether there had been such formal negotiations as to Tartavull's employment after the Merger, it was always clear that Siris' intent had been for Tartavull to continue in his role as CEO of the post-merger company.  For instance, in each of Siris' proposals, it noted that it looked forward to working with Xura's then current leadership team "to accelerate Xura's transformation without the scrutiny and pressures of the public markets".  It was also well known within the market that Siris "typically keep[s] management teams in place," as stated in a Goldman document produced in the Appraisal Action.

## LOSS CAUSATION

66.     The false and misleading Proxy and Supplemental Proxy were an essential link in the chain of events leading to the Merger, and in proximately causing damages to Class members. Defendants' misrepresentations regarding Tartavull's extraordinary role in the Merger negotiations, and the manner in which the Board and its chosen subcommittee played an inconsequential role, often undercut by Tartavull, the forcing out of the bidding process a competing bidder for reasons that were unreasonable, based on facts and understandings not disclosed in the Proxy, the failure to disclose the interest expressed by a potential competing bidder and its diversion to a co-investor role with Siris, and the misleading statements as to Tartavull's conflicting interests, caused Plaintiff and members of the Class to accept merger consideration that failed to adequately value Xura's shares. As a result of their holdings of Xura shares at the record date, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action individually and as a class action on behalf of all holders of Xura common stock who were harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

68.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

69.     The Class is so numerous that joinder of all members is impracticable. As of the close of business on Xura's record date—July 11, 2016—approximately 26,190,837 shares of Xura common stock were outstanding and entitled to vote on the Merger. Those shares were held by hundreds, if not thousands, of individuals and entities located throughout the country.

70.     Questions of law and fact are common to the Class, including, among others, (i) whether Defendants violated the Exchange Act; and (ii) whether Defendants' conduct irreparably harmed Plaintiff and the other members of the Class.

71.     There is a well-defined community of interests in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants disregarded that their statements and/or omissions were false and misleading;

(e)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

72.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

73.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

74.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

75.     Xura's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

76.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Xura who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## COUNT  I

### Claim for Violation of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against Xura and the Individual Defendants

77.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

78.     The Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.

79.     The Proxy was prepared, reviewed, and/or disseminated by the Defendants. By virtue of their positions within Xura, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy and acted on behalf of Xura.

80.     The Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

81.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder will consider them important in deciding how to vote on the merger. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

82.     The Proxy is an essential link in causing Xura stockholders to approve the merger.

83.     By reason of the foregoing, the Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

84.     Because of the false and misleading statements in the Proxy and Proxy Update, Plaintiff and the Class were harmed.

## COUNT  II

### Claim for Violation of Section 20(a) of the Exchange Act
### Against Tartavull

85.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

86.     Tartavull acted as a controlling person of Xura within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his position and participation in and/or awareness of Xura's operations and/or intimate knowledge of the false statements contained in the Proxy, Tartavull had the power to control and did influence and control, directly or indirectly, the decision making of Xura, including the content and dissemination of the various statements that Plaintiff contends, are false and misleading.

87.     Tartavull was provided with or had unlimited access to copies of the Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

88.     As set forth above, Tartavull had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of his position as a controlling person, Tartavull is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Tartavull's conduct, Plaintiff and the Class were harmed.

### PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as Rule 14a-9, promulgated thereunder;

D.      Awarding Plaintiff the costs of this action, including a reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: August 10, 2018                      Respectfully submitted,

**LABATON SUCHAROW LLP**

*/s/ Ned Weinberger*
Ned Weinberger (Bar No. 5256)
Thomas Curry (Bar No. 5877)
300 Delaware Ave., Suite 1340
Wilmington, DE 19801
Telephone:  (302) 573-2540

**LABATON SUCHAROW LLP**
Christopher J. Keller
Eric J. Belfi
Ira A. Schochet
Francis P. McConville
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477

*Counsel for Plaintiff*

## CERTIFICATION

I, Gerard Grysko, as Deputy Director of Wayne County Employees' Retirement System ("WCERS"), hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of WCERS.  I have reviewed a complaint prepared against Xura, Inc. ("Xura") alleging violations of the federal securities laws;

2.     WCERS did not purchase common stock of Xura at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     WCERS is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.     WCERS held 267 shares of Xura common stock as of the record date of July 11, 2016;

5.     WCERS sought to serve as a lead plaintiff in the following class actions filed under the federal securities laws during the last three years:

*Shoemaker v. Cardiovascular Systems, Inc.*, No. 0:16-cv-00568 (D. Minn.)
*Galmi v. Teva Pharmaceuticals Industries Limited*, No. 2:16-cv-08259 (C.D. Cal.)
*In re Amtrust Financial Services, Inc. Securities Litigation*, No. 1:17-cv-01545 (S.D.N.Y.)
*Bettis v. Envision Healthcare Corporation*, No. 3:17-cv-01112 (M.D. Tenn.)
*Bhatt v. Tech Data Corporation*, No. 8:17-cv-02185 (M.D. Fla.)
*Bray v. Frontier Communications Corporation*, No. 3:17-cv-1617 (D. Conn.)
*Chun v. Fluro Corporation*, No. 3:18-cv-1338 (N.D. Tex.)

6.     WCERS sought to serve as a representative party but not as a lead plaintiff in the following class action filed under the federal securities laws during the last three years:

*Knurr v. Orbital ATK, Inc.*, No. 1:16-cv-01031 (E.D. Va.)

7.     Beyond its pro rata share of any recovery, WCERS will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 9th day of August, 2018.

Gerard J. Grysko
*Deputy Director*
*Wayne County Employees' Retirement System*