**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of Itself and all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )    Civil Action No. 18-1229-CFC |
| MAVENIR, INC. F/K/A XURA, INC., PHILIPPE TARTAVULL, HENRY R. NOTHHAFT, SUSAN D. BOWICK, JAMES BUDGE, NICCOLO DE MASI, MATTHEW A. DRAPKIN, DORON INBAR, and MARK C. TERRELL, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**REPORT AND RECOMMENDATION**

## I. INTRODUCTION

Presently before the court in this action for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 are the following motions:[1] (1) the motion to dismiss under Rules 12(b)(1) and 12(b)(6), filed by defendants Mavenir, Inc. ("Mavenir")[2] and outside directors Henry R. Nothhaft, Susan D. Bowick, James Budge, Niccolo De Masi, Matthew A. Drapkin, Doron Inbar, and Mark C. Terrell (collectively, the "Outside Director Defendants"),[3] (D.I. 67); and (2) the motion to dismiss under Rules

---

[1] The briefing, declarations, and other filings associated with the pending motions can be found at D.I. 66, D.I. 68, D.I. 69, D.I. 71, D.I. 72, and D.I. 74.

[2] Mavenir was formerly known as Xura, Inc. ("Xura").  (D.I. 60 at ¶ 12)  In February 2017, Xura completed transactions to acquire Mitel Mobility, Inc. and Ranzure Networks, Inc.  (*Id.*)  Upon completion of the transactions, Xura adopted the new name to reflect the combined company. (*Id.*)

[3] Other than director Philippe Tartavull, all of the individual defendants were outside directors. (D.I. 60 at ¶¶ 13-20)

12(b)(1) and 12(b)(6), filed by defendant Philippe Tartavull (together with Mavenir and the Outside Director Defendants, "Defendants") (D.I. 65).  For the following reasons, I recommend that the court GRANT the motion to dismiss filed by Mavenir and the Outside Director Defendants, and GRANT the motion to dismiss filed by Mr. Tartavull without prejudice.

## II.    BACKGROUND

The following facts, which are taken from the amended complaint, are assumed to be true for purposes of deciding the pending motions.  *See Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).  On August 10, 2018, plaintiff Wayne County Employees' Retirement System ("Plaintiff") initiated this action against Defendants for violations of the Exchange Act arising from the dissemination of allegedly false or misleading proxy materials in connection with a merger transaction between Siris Capital Group, LLC[4] and Xura.  (D.I. 60 at ¶¶ 1-2)  Xura, which offered products and services to telecommunications companies and other businesses, became a publicly traded company in 2012.  (*Id.* at ¶¶ 21-22)  As president and chief executive officer ("CEO") of Xura, Mr. Tartavull initiated discussions with Siris about a potential merger transaction beginning in October 2013.  (*Id.* at ¶ 25)

In January 2015, Siris expressed interest in acquiring Xura for $24 per share, but then reduced its offer to $20 to $22 per share the following month after conducting due diligence.  (*Id.* at ¶ 28)  Xura's board rejected Siris' proposal on February 11, 2015.  (*Id.*)  Siris submitted another indication of interest to Xura in October 2015, proposing an acquisition price of $30 to $32.50 per share.  (*Id.* at ¶ 37)  Xura's board again rejected the proposal.  (*Id.* at ¶ 35)  Siris

_____

[4] The amended complaint explains that Sierra Private Holdings II Ltd. acquired Xura through its wholly owned subsidiary, Sierra Private Merger Sub Inc.  (D.I. 60 at ¶ 1)  The amended complaint identifies both Sierra entities as affiliates of Siris Capital Group, LLC, and collectively defines all three entities as "Siris."  (*Id.*)  References to "Siris" in this Report and Recommendation reflect the definition of the term as used in the amended complaint.

thereafter increased its proposal to $35 per share.  (*Id.* at ¶ 40)  In November 2015, Xura retained Goldman Sachs as its financial advisor to continue negotiations with Siris.  (*Id.* at ¶ 41)

Siris sent a letter reaffirming its $35 per share offer on December 2, 2015.  (*Id.* at ¶ 43) The following day, the Xura board formed a "Strategic Committee" comprised of Mr. Tartavull, Mr. Nothhaft, and Mr. Drapkin to "review, evaluate and negotiate the terms of a potential transaction with Siris and to make certain decisions between meetings of the board of directors." (*Id.* at ¶ 44)  Xura and Siris held a series of due diligence sessions starting in January 2016.  (*Id.* at ¶ 48)

On January 25, 2016, Mr. Tartavull spoke with Frank Baker, a managing partner at Siris, without disclosing the conversation to Goldman Sachs.  (*Id.* at ¶¶ 42, 49)  Mr. Tartavull had a number of other undisclosed conversations with Siris personnel, despite a request by Goldman Sachs to be included in all such conversations.  (*Id.* at ¶ 50)  Goldman Sachs reached out to numerous other potential bidders in January 2016, and four of those potential bidders executed nondisclosure agreements.  (*Id.* at ¶ 51)

On February 18, 2016, Siris advised Goldman Sachs that it intended to reduce its offer price as a result of negative findings in the due diligence process.  (*Id.* at ¶¶ 52, 81)  In a February 24, 2016 meeting between Mr. Tartavull and Mr. Baker that was not disclosed to the Strategic Committee, the Xura board, or Goldman Sachs, Mr. Tartavull suggested that Siris revise its merger price to $28 per share.  (*Id.* at ¶ 54)  The following day, Siris revised its offer from $35 per share to $28 per share.  (*Id.* at ¶ 53)  Mr. Tartavull continued to have direct communications with Siris without notifying Goldman Sachs.  (*Id.* at ¶¶ 55-56)

On March 13, 2016, the Carlyle Group provided Goldman Sachs with an indication of interest between $26 and $27 per share, conditioned on the results of its due diligence analysis.

3

(*Id.* at ¶ 57)  In response, Goldman Sachs pressured the Carlyle Group to raise its price to $28 per share and speed along any remaining due diligence.  (*Id.* at ¶ 58)  The Carlyle Group then dropped out of the bidding process, and Xura and Siris entered into an exclusivity agreement that prevented Xura from soliciting additional offers.  (*Id.* at ¶¶ 60-61)  Siris continued to lower its offer price during the exclusivity period, and Xura and Siris eventually came to an agreement on a price of $25 per share.  (*Id.* at ¶¶ 62-67)

Xura publicly announced that it was in negotiations to sell itself for $25 per share to an unnamed entity on April 15, 2016.  (*Id.* at ¶ 68)  Francisco Partners then expressed interest in competing to bid on Xura.  (*Id.* at ¶ 69)  But instead of submitting a competing proposal, Francisco Partners contacted Siris about a potential co-investment to buy Xura, which never materialized.  (*Id.* at ¶ 71)

The board approved the merger agreement to sell Xura to Siris for $25 per share on May 22, 2016.  (*Id.* at ¶ 74)  On the following day, Xura and Siris executed the merger agreement and formally announced the merger.  (*Id.*)  Xura filed its preliminary proxy statement with the Securities Exchange Commission ("SEC") on June 28, 2016, and the final proxy statement was filed on July 12, 2016.  (*Id.* at ¶ 79)  On July 26, 2016, Xura filed its supplemental proxy statement with the SEC.  (*Id.* at ¶¶ 88-89)

The record date for Xura shareholders to be eligible to vote on the merger was July 11, 2016.[5]  (*Id.* at ¶ 2)  The shareholders voted to approve the merger on August 16, 2016, and the

---

[5] On July 11 and July 22, 2016, Xura shareholders filed suits in the United States District Court for the District of Massachusetts seeking to enjoin the merger ("Massachusetts Actions").  *See In re Xura, Inc. S'Holder Litig.*, 2018 WL 6498677, at *8 (Del. Ch. Dec. 10, 2018).  On July 26, 2016, Xura, Siris and the plaintiffs in the Massachusetts Actions reached an agreement that Xura would file a supplemental proxy statement in exchange for release and dismissal of the claims related to the merger that were filed in the Massachusetts Actions.  *Id.*; *see also Lesser v. Xura,*

merger closed three days later after a majority of Xura shareholders voted to approve the merger. (*Id.* at ¶ 3)  Four months later, Mr. Tartavull left his position as CEO of Xura.  (*Id.* at ¶ 13)

## III.   LEGAL STANDARDS

### A.   Rule 12(b)(1) - Standing

To establish Article III standing, a plaintiff must prove: (1) an injury-in-fact, (2) fairly traceable to the challenged conduct, (3) that is likely to be redressed by a favorable judicial decision.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  At the pleading stage, the plaintiff must " 'clearly . . . allege facts demonstrating' each element."  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  The question presently before the court is whether the complaint adequately pleads an injury-in-fact, which requires a showing that the plaintiff "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id.* at 1548 (internal quotation marks and citations omitted).

Motions under Rule 12(b)(1) may present either a facial or factual challenge to the court's standing to hear a case.  *Gould Elecs. Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000).  Where, as here, a defendant challenges whether the facts pleaded in the complaint are sufficient to create standing, it is considered a facial challenge evaluated under the same standard as a Rule 12(b)(6) motion.  *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 109 (3d Cir. 2019); *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 610 (D. Del. 2018).  "In reviewing a facial attack, 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'"  *Constitution Party of Pa. v.*

---

*Inc. et al.*, C.A. No. 16-11445-MLW (D. Mass. July 11, 2016); *Barney v. Xura, Inc.*, C.A. No. 16-11521-MLW (D. Mass. July 22, 2016).

*Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)).  Under this standard, general factual allegations of injury may be sufficient, so long as the complaint "clearly and specifically set[s] forth facts sufficient to satisfy" the requirements of Article III.  *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990)).

### B.       Rule 12(b)(6) - Failure to State a Claim

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff.  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790-91 (3d Cir. 2016).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

The court's determination is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal citations and quotation marks

omitted).  This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]."  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).  The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 663-64.

## IV.   DISCUSSION

### A.   Standing

Defendants first argue that the amended complaint should be dismissed for lack of standing because Plaintiff does not adequately allege an injury-in-fact.  (D.I. 68 at 6; D.I. 66 at 7) According to Defendants, Plaintiff's allegation that it owned Xura stock on the record date of the merger is not sufficient to support an award of post-closing damages.  (D.I. 68 at 7)  Defendants contend that the lack of pleaded allegations regarding Plaintiff's participation in the merger or actual receipt of inadequate merger consideration for the Xura shares are fatal to the claims.  (*Id.* at 6-7)

In response, Plaintiff contends that the amended complaint adequately pleads an injury-in-fact because it contains allegations that the false or misleading proxy materials caused Plaintiff to accept the inadequate merger consideration, resulting in Plaintiff's economic loss. (D.I. 71 at 24)  Plaintiff submits a declaration with its responsive brief establishing that Plaintiff owned Xura shares through the closing of the merger on August 19, 2016.  (*Id.* at 25)

I recommend that the court grant Defendants' Rule 12(b)(1) motion.  The amended complaint does not expressly allege that Plaintiff owned Xura shares on the closing date of the merger, or that Plaintiff actually received the allegedly inadequate merger consideration.

Plaintiff focuses on a paragraph of the amended complaint alleging that the material misrepresentations and omissions by Defendants "caused Lead Plaintiff and members of the Class to approve the merger and accept merger consideration that failed to adequately value Xura's shares.  As a result of their holdings of Xura shares at the record date, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws."  (D.I. 60 at ¶ 98; *see also* ¶ 103)  This portion of the pleading ties allegations of Plaintiff's injury to its ownership of the shares on the record date of the merger and Plaintiff's approval of the merger, but it does not establish that Plaintiff owned the shares on the closing date.  The fact that the amended complaint specifically alleges Plaintiff's ownership of the stock on the record date of the merger, but remains silent on Plaintiff's ownership interests on the closing date of the merger, does not suffice to show the existence of an injury-in-fact.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (recognizing that "if ... the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss" and a plaintiff cannot plead injury).

The declaration attached to Plaintiff's answering brief shows that Plaintiff may remedy this deficiency in an amended pleading.  The declaration states that Plaintiff owned the shares not only on the record date of the merger on July 11, 2016, but also on August 19, 2016, when the merger closed and Plaintiff received the allegedly inadequate merger consideration.  (D.I. 72 at ¶ 4)  However, on a facial challenge under Rule 12(b)(1), the court must assess the sufficiency of the pleading without consideration of documents outside the pleading.  *See Constitution Party of Pa.*, 757 F.3d at 358 ("In reviewing a facial attack, 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'" (internal quotation marks omitted)).  Consequently, I

recommend that the court grant without prejudice Defendants' motion to dismiss under Rule 12(b)(1).

### B.  Failure to State a Claim

Defendants allege that the amended pleading fails to state a claim under Section 14(a) of the Exchange Act, which prohibits soliciting a shareholder's vote "in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78n(a)(1).  Rule 14a-9, which was promulgated by the Securities and Exchange Commission ("SEC") pursuant to Section 14(a) of the Exchange Act, prohibits the solicitation of a shareholder's vote through a communication "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).  To prevail on a claim under Section 14(a), the plaintiff must prove that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (quotation marks and citation omitted).

The parties dispute whether the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") extend to Plaintiff's cause of action under Section 14(a) of the Exchange Act, which sounds in negligence.  (11/18/2020 Tr. at 47:2-9; D.I. 71 at 38-40; D.I. 74 at 17 n.15)  "It . . . appears to be an open question as to whether Section 14(a) claims pled in terms of negligence are subject to Rule 9(b) or PSLRA particularity requirements." *Jaroslawicz v. M&T Bank Corp.*, C.A. No. 15-897-RGA, 2017 WL 1197716, at *3 (D. Del. Mar.

30, 2017).  Some courts in this district and elsewhere have declined to apply the heightened

pleading requirements of the PSLRA to Section 14(a) claims sounding in negligence.  *See id.* at

*4 (declining to extend Rule 9(b) and PSLRA pleading requirements to Section 14(a) claims

sounding in negligence);[6] *see also In re Willis Towers Watson Plc Proxy Litig.*, 439 F. Supp. 3d

704 (E.D. Va. 2020) (same); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 538 (D.

Del. 2012) (same); *In re Bank of Am. Corp.*, 757 F. Supp. 2d 260, 321–22 (S.D.N.Y. 2010)

(applying Rule 8(a) pleading standard to Section 14(a) claims sounding in negligence); *In re*

*Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 729 (D. Del. 2000) (declining to apply the heightened

PSLRA pleading requirements to Section 14(a) claim sounding in negligence).  Other courts

have found that Section 14(a) claims sounding in negligence are subject to the heightened

pleading requirements of the PSLRA.  *See Kooker on Behalf of Hecla Mining Co. v. Baker*, C.A.

No. 19-1299-CFC, 2020 WL 6287248, at *3 (D. Del. Oct. 27, 2020); *In re U.S. West, Inc. Sec.*

*Litig.*, 201 F. Supp. 2d 302, 305 (D. Del. 2002).

       Consistent with recent case authority from the assigned District Judge in this matter, I

recommend that the court apply the heightened pleading standard of the PSLRA to Plaintiff's

---

[6] On appeal, the Third Circuit did not disturb the district court's ruling on this point after
concluding that the outcome would remain the same regardless of the applicable pleading
standard:

> The District Court reviewed the allegations in the second amended complaint
> under the general pleading standard set out in Rule 8 of the Federal Rules of Civil
> Procedure. The shareholders contend that this was proper because their claims
> sounded in negligence. M&T argues that all § 14(a) claims, even those that sound
> in negligence, are subject to the heightened pleading requirements of the Private
> Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1).
> Ultimately, however, we need not resolve this issue. Neither party has convinced
> us that the pleading standard is determinative here.

*Jaroslawicz v. M&T Bank Corp.*, 912 F.3d 96, 104 (3d Cir. 2018).

securities claims because the text of the statute "expressly provides that it applies

'[i]n any private action arising under' the Exchange Act." *See Kooker*, 2020 WL 6287248, at *3

(quoting 15 U.S.C. § 78u–4(b)(1)).  Accordingly, Plaintiff must "plead the who, what, when,

where and how: the first paragraph of any newspaper story." *Institutional Inv'rs Grp. v. Avaya,

Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (citations omitted).  Under either pleading standard,

however, the amended complaint in this case fails to adequately plead a material misstatement or

omission in the proxy materials.

### 1.    Misstatement or omission in proxy materials

#### a.    Material communications prior to the Merger Agreement

First, the parties dispute whether the proxy materials adequately disclosed pre-merger

communications.  Defendants allege that there was no requirement to disclose every single

communication between Mr. Tartavull and Siris, and any details omitted from the proxy

statement would not have altered the stockholders' decisions in voting on the merger.  (D.I. 66 at

9-10)  In response, Plaintiff alleges that the proxy statement was misleading because it caused

shareholders to believe that the Strategic Committee and Goldman Sachs led the merger

negotiations, without disclosing Mr. Tartavull's direct communications with Siris.  (D.I. 71 at 7-

9)  Plaintiff argues that the proxy statement was misleading precisely because it contained

granular detail about certain pre-merger communications, while it selectively omitted other

communications.  (*Id.* at 9-10)

In particular, Plaintiff focuses on the proxy statement's failure to disclose a meeting

between Mr. Tartavull and a Siris representative on February 24, 2016, the day before Siris sent

a revised proposal lowering its offering price from $35 to $28 per share.  (D.I. 71 at 11)  The

amended complaint alleges that Siris told Goldman Sachs on February 18, 2016 of its intent to

lower its offer price for Xura, and Siris then submitted its revised indication of interest on February 25, 2016, reducing its offer from $35 to $28 per share.  (D.I. 60 at ¶¶ 52-53)  But the pleading alleges that the proxy statement did not disclose a February 24, 2016 meeting between Mr. Tartavull and Siris, during which Mr. Tartavull allegedly advised Siris to reduce its price to $28 per share.  (*Id.* at ¶ 54)

These allegations do not plausibly identify a material omission by Defendants in the proxy statement.  Both the proxy statement[7] and the amended complaint acknowledge that Siris informed Goldman Sachs on February 18, 2016 of its intent to lower the offer price, prior to the February 24 meeting between Mr. Tartavull and Siris.  (D.I. 60 at ¶¶ 52-54; D.I. 69, Ex. A at 30)  The proxy statement discloses that Siris "intended to submit a revised indication of interest based on the negative findings in the due diligence Siris had conducted since its December 2, 2015 letter."  (D.I. 69, Ex. A at 30)  Thus, the pleaded allegations do not plausibly suggest that Mr. Tartavull's undisclosed February 24 meeting was the impetus for Siris' decision to lower its offer.

Moreover, the pleading does not establish a material connection between Mr. Tartavull's suggestion that Siris should lower its price to $28 per share and the ultimate decision of the shareholders to approve the merger transaction at a price of $25 per share.  "[A] misrepresentation or omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]."  *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (internal quotations omitted).  Here, the proxy

_____

[7] Defendants submitted a request for judicial notice regarding the proxy materials and other publicly available documents.  (D.I. 69)  Plaintiff does not object to the court's consideration of the proxy materials.  (D.I. 71; 11/18/2020 Tr. at 11:8-15)  The proxy materials are "integral to or explicitly relied upon in the complaint," and may therefore be considered at this stage of the proceedings.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

12

statement represents that Siris lowered its price to $28 on February 25, 2016 and issued a subsequent revised indication of interest at $25 per share in April 2016.  (D.I. 69, Ex. A at 31, 33)  The ultimate share price approved by the shareholders in the merger agreement executed on May 23, 2016 was $25 per share, consistent with the April 2016 revision.  (*Id.* at 34-35)  The amended complaint is devoid of allegations suggesting that reductions in the proposed merger price following the February 25, 2016 revised indication of interest were attributable to undisclosed meetings between Mr. Tartavull and Siris.  (11/18/2020 Tr. at 19:2-17)  Thus, a reasonable shareholder would not plausibly consider the undisclosed February 24 meeting between Mr. Tartavull and Siris important in deciding whether to approve the merger transaction at $25 per share.

To the extent that the amended complaint identifies other undisclosed communications between Mr. Tartavull and Siris, such as a January 25, 2016 conversation between Mr. Tartavull and Mr. Baker, the pleading does not specify anything about these communications that would have impacted the shareholders' analysis in approving the merger.  (D.I. 60 at ¶¶ 48-49)  Moreover, the amended complaint and the proxy statement confirm that Mr. Tartavull had the authority to communicate with Siris about the proposed merger.  Although the pleading alleges that "Tartavull and Siris repeatedly cut Goldman out of the loop," it also acknowledges that "[t]he Board permitted Tartavull to have a lead role in negotiations with Siris."  (*Id.* at ¶¶ 45, 48)  Similarly, the proxy statement confirms that "the board of directors authorized senior management to continue discussions with Siris regarding a potential transaction and to provide additional due diligence information to Siris."  (D.I. 69, Ex. A at 29)  The pleading does not plausibly establish a substantial likelihood that disclosure of the communications between Mr. Tartavull and Siris "would have been viewed by the reasonable investor as having significantly

13

altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see also In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 521 (S.D.N.Y. 2019) ("A proxy is not required to disclose every single communication that a company had with bidders and interested parties.").

Plaintiff further contends that Mr. Tartavull's undisclosed communications with Siris presented a material conflict of interest.[8]  (D.I. 71 at 12-13)  Plaintiff directs the court to a paragraph of the amended complaint alleging that "Tartavull placed a term in his contract that gave him the right to terminate his employment for good reason and trigger change-in-control payments if Xura was purchased by a private-equity firm."  (D.I. 60 at ¶ 22)  But the change in control term of Mr. Tartavull's employment agreement was disclosed in the proxy statement, which expressly acknowledged that executive officers and directors may have interests in the merger that diverged from the interests of the shareholders.  (D.I. 69, Ex. A at 49) (disclosing the possibility of "cash payments and other benefits payable under change in control agreements with our executive officers, including in the event of a qualifying termination of employment in connection with the merger.").  This allegation does not plausibly support an inference that Mr. Tartavull had a financial interest in consummating the merger with Siris over other bidders because the same provision of the employment agreement would apply regardless of which private equity firm ultimately purchased Xura.[9]  (D.I. 60 at ¶ 22; 11/18/2020 Tr. at 14:20-15:12)

---

[8] During oral argument, counsel for Plaintiff did not pursue this argument and instead alleged that the Section 14(a) claim did not depend on the allegations of a material conflict of interest by Mr. Tartavull.  (11/18/2020 Tr. at 55:24-56:3; 56:20-57:4)

[9] Mr. Tartavull's alleged conflict of interest was not without redress.  Civil actions for appraisal and breach of fiduciary duty  were commenced in the Delaware Court of Chancery prior to the filing of this action.  When the breach of fiduciary duty claims were challenged on a motion to dismiss in the Court of Chancery, the claim survived as the court found the plaintiff had adequately pleaded that a conflicted fiduciary directed Xura to consummate the undervalued

**b.      Role of the Strategic Committee**

Plaintiff alleges that the proxy statement misrepresented the role of the Strategic Committee by suggesting that it had extensive authority when, in reality, it played no meaningful role in the merger process.  (D.I. 71 at 15)  But Defendants argue that the proxy statement never represented the Strategic Committee would take over the board's responsibilities on the merger transaction.  (D.I. 66 at 14)

The amended complaint does not plausibly support Plaintiff's position that the proxy statement misrepresented the role of the Strategic Committee.  According to the amended complaint, "the Strategic Committee was not meaningfully involved in the process that led to the Merger" because it "never met with Siris, never took formal action, and never kept minutes." (D.I. 60 at ¶ 44)  But these allegations do not contradict the description of the Strategic Committee in the proxy statement, which explains that the Strategic Committee was established "for convenience purposes . . . to review, evaluate and negotiate the terms of a potential transaction with Siris and to make certain decisions between meetings of the board of directors." (D.I. 69, Ex. A at 29)  The proxy statement reiterates that "[t]he board of directors authorized the management to continue discussions with Siris regarding a potential transaction on a non-exclusive basis," and it outlines the role of the full board in considering and approving every major development in the merger process.  (*Id.* at 29, 31-35)  In this regard, the proxy statement does not misrepresent the Strategic Committee's limited role in the merger process.

---

transaction for reasons other than the best interests of the stockholders.  *See In re Xura, Inc. S'Holder Litig.*, 2018 WL 6498677, at *12-13 (Del. Ch. Dec. 10, 2018).

### c.    Goldman Sachs' role as Xura's financial advisor

The parties' next dispute focuses on the amended complaint's assertion that the proxy statement overstated the role of Goldman Sachs in negotiations and failed to disclose that Siris and Mr. Tartavull did not include Goldman Sachs in their negotiations.  (D.I. 60 at ¶¶ 83-84) Defendants contend that these allegations do not plausibly identify a material misrepresentation because the proxy statement accurately describes the prominent role Goldman Sachs played in the merger negotiations, while also acknowledging that Mr. Tartavull had contacts with Siris both with and without Goldman Sachs.  (D.I. 66 at 15; D.I. 68 at 13)  But Plaintiff contends that the proxy statement's representations regarding Goldman Sachs' role are misleading because they do not disclose the exclusion of Goldman Sachs from communications between Siris and Mr. Tartavull.  (D.I. 71 at 16-17)  Plaintiff argues that the significance of Goldman Sachs' role, its level of influence in the merger negotiations, and the amount of success it achieved in locating other potential bidders are questions of fact not ripe for resolution on a motion to dismiss.  (*Id.* at 18)

The amended complaint does not identify a material misrepresentation in the proxy statement regarding Goldman Sachs' role in the merger negotiations.  The proxy statement accurately describes the efforts Goldman Sachs undertook to fulfill its role as financial advisor in the merger negotiations, including holding discussions with Siris and other potential bidders, advising the board about the status of negotiations, reviewing due diligence matters, overseeing the "go-shop" process, and providing a financial analysis of the Siris merger.  (D.I. 69, Ex. A at 29-36)  That Goldman Sachs was not included in every communication during the negotiations is disclosed in the proxy statement.  (D.I. 69, Ex. A at 32) (citing meetings between Mr. Tartavull and Siris, without Goldman Sachs, on March 24 and April 6, 2016).  This is consistent with

16

representations in the proxy statement that Goldman Sachs acted at the direction of Xura and its board, and senior management played a crucial role in conducting the merger negotiations.  (*Id.*, Ex. A at 28) (authorizing senior management to continue discussions with Siris after retaining Goldman Sachs to discuss the merger with Siris "at the direction of the Company").  Thus, Plaintiff has not raised a plausible allegation that the role of Goldman Sachs was misrepresented in the proxy statement.

### d.      Xura's interaction with the Carlyle Group

Next, Defendants argue that the amended complaint fails to identify a material misstatement or omission with respect to Xura's interaction with the Carlyle Group.  According to Defendants, the proxy statement accurately discloses Goldman Sachs' efforts to pressure the Carlyle Group to raise its offer price to $28 per share.  (D.I. 66 at 16-17)  But Plaintiff argues that the proxy statement is misleading despite this disclosure because it fails to acknowledge the likelihood that the Carlyle Group would have been a viable alternative bidder if not for the unreasonable conditions imposed by Siris.  (D.I. 71 at 18)  According to Plaintiff, Mr. Tartavull's personal motives to achieve a deal with Siris undermined the likelihood of a competitive bid by the Carlyle Group.  (*Id.* at 18-19)

The proxy statement did not omit any material representations about Xura's interaction with the Carlyle Group.  To the contrary, a review of the proxy statement shows that it disclosed the $26 to $27 per share indication of interest by the Carlyle Group, and Xura's response through Goldman Sachs that a price of $28 or higher was needed promptly to remain competitive:

> On March 13, 2016, the remaining potential buyer contacted during the market check process provided Goldman Sachs with a verbal indication of interest in the range of $26.00 to $27.00 per share, but indicated that significant diligence would be required to confirm that preliminary price range. At the direction of the Company, representatives of Goldman Sachs indicated that the offering price

17

> would need to be $28.00 per share or higher and that diligence would need to be completed on an expedited time frame. At this point the buyer indicated it would be unable to support an offer at the indicated level and that it would not move forward in the bidding process. No further discussions took place with the potential financial buyer thereafter until the Go-Shop Period.

(D.I. 69, Ex. A at 31-32)  Plaintiff argues that the proxy statement failed to disclose that Xura eliminated the Carlyle Group as an alternative bidder by imposing arbitrary conditions on it. (D.I. 71 at 18)  But Defendants fully disclosed the facts regarding the conditions placed on the Carlyle Group in the proxy statement.  At the time the board pressured the Carlyle Group to raise its price to $28 within an expedited time frame, Xura had an offer of $28 per share from Siris after extensive due diligence.  (D.I. 69, Ex. A at 31)  Defendants had no obligation to characterize the conditions imposed on the Carlyle Group as arbitrary in the proxy statement.

Plaintiff suggests that the proxy statement should have also disclosed the likelihood that Siris would underbid the Carlyle Group and indicated that Mr. Tartavull favored a deal with Siris.  (D.I. 71 at 18; D.I. 60 at ¶¶ 73, 86, 89)  But the offer of $28 per share from Siris after extensive due diligence supported the desirability of a merger with Siris under the circumstances. (D.I. 69, Ex. A at 31)  Moreover, courts have held that "a preference for one bidder over another does not amount to a Section 14(a) violation," particularly when "one bidder may stand out amongst the rest, and a company may find that a merger with, or acquisition by, that company is most desirable."  *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 517 (S.D.N.Y. 2019).

### e.      Unsolicited overture from Francisco Partners

Defendants also argue that there was no duty to disclose the unsolicited overture by Francisco Partners because Francisco Partners knew Xura was already engaged in exclusive negotiations with another bidder.  (D.I. 66 at 17)  According to Defendants, the proxy statement's disclosure of the "go-shop" process was sufficient, and there was no duty to

specifically identify Francisco Partners as one of the contacted parties or to explain why Francisco Partners did not ultimately make a bid.  (*Id.* at 18)

However, Plaintiff alleges that there was a duty to disclose the circumstances under which Francisco Partners expressed an interest in bidding and then declining to bid, and the proxy statement's representation that none of the parties contacted during the go-shop process submitted a bid was materially misleading as a result.  (D.I. 71 at 19-20)  Plaintiff argues that this omission was particularly misleading due to Mr. Tartavull's communications with Francisco Partners regarding Siris' bid in contravention of the non-disclosure agreement between Siris and Xura, and the ultimate co-investment by Francisco Partners and Siris that was approved by Xura. (*Id.* at 21)

Defendants' failure to disclose the circumstances surrounding the non-specific overture of Francisco Partners does not plausibly amount to a material misrepresentation or omission. The proxy statement accurately disclosed the results of the go-shop process by indicating that twenty-six parties were contacted, three requested information and entered into confidentiality agreements, and none made a bid:

> During the Go-Shop Period to date, 26 prospective buyers . . . have been contacted regarding their potential interest in a transaction with the Company. As of the date of the filing of this proxy statement, the Company received requests for information from three parties (all of which were financial buyers) that negotiated and entered into confidentiality agreements with the Company and were provided with non-public information relating to the Company. None of the parties contacted during the go-shop process, including the three parties that entered confidentiality agreements with the Company, submitted an Acquisition Proposal to the Company or its representatives and the three parties that entered confidentiality agreements with the Company have declined to go forward with the process.

(D.I. 69, Ex. A at 35)  The amended complaint alleges that Francisco Partners requested the opportunity to bid during the go-shop process, but the proxy statement does not explain why

19

Francisco Partners ultimately did not make a bid for Xura.  (D.I. 60 at ¶¶ 69-70)  However, the pleading does not allege that Defendants were aware of the reason Francisco Partners chose not to bid, or that Defendants knew how Francisco Partners learned that Siris was the bidder.  (*Id.* at ¶ 71) ("Francisco Partners somehow learned that Siris was Xura's counterparty. . . .").  Without this knowledge, Defendants could not plausibly disclose this information in the proxy statement.

### f.    Agreements on continuing employment

Finally, Defendants argue that there was no misrepresentation in the proxy statement about the status of Mr. Tartavull's employment.  According to Defendants, the failure of Xura and Siris to reach an agreement about Mr. Tartavull's continued employment does not contradict Plaintiff's argument that Siris intended to retain Mr. Tartavull as CEO.  (D.I. 66 at 18) Defendants highlight the fact that Mr. Tartavull was not retained under a new agreement and he left his position four months after the merger closed.  (*Id.* at 18-19)

Plaintiff argues that, despite the lack of a consummated agreement, it was clear that Siris intended to have Mr. Tartavull continue as CEO after the merger.  (D.I. 71 at 21; D.I. 60 at ¶ 89) Accordingly, Plaintiff contends that the proxy statement inaccurately represented that no agreement had been reached, and Defendants were obligated to describe the informal employment negotiations.  (D.I. 71 at 21-22)

The proxy materials did not materially misrepresent Mr. Tartavull's employment status. Instead, they correctly disclosed that the parties "have not reached any agreements about the continuing employment of the executive officers of the Company."  (D.I. 69, Ex. B at 7)  The amended complaint alleges that Mr. Tartavull continued his employment for four months after the merger closed, but there is no allegation that Mr. Tartavull executed another employment agreement or increased his compensation.  (D.I. 60 at ¶ 13)  The allegation that "it was always

clear that Siris' intent had been for Tartavull to continue in his role as CEO of the post-merger company" does not contradict the proxy's representation that no employment agreement had been reached.  (*Id.* at ¶ 89)

### 2.    Loss causation

Having determined that the amended complaint fails to adequately plead an actionable misstatement or omission in the proxy statement, the court need not reach the sufficiency of the allegations regarding loss causation.

### 3.    Additional pleading failures[10]

Defendants further contend that the amended complaint does not plausibly allege the Outside Director Defendants knew or should have known that the challenged disclosures were false or misleading.  (D.I. 68 at 18)  I agree with Defendants.  The amended complaint fails to state a claim against the Outside Director Defendants because it expressly acknowledges that they were not informed of certain developments in the merger negotiations that were misstated in or omitted from the proxy materials.  (*See, e.g.*, D.I. 60 at ¶ 54) ("The Board, Strategic Committee, and Goldman were not informed of [the February 24, 2016] meeting.").

---

[10] Defendants also cite improper group pleading allegations regarding the Outside Director Defendants.  (D.I. 68 at 17-18)  But Plaintiff points to portions of the amended complaint alleging that each director solicited shareholders' proxies, which Plaintiff alleges is sufficient for liability to attach.  (D.I. 71 at 36-37)  In particular, the amended complaint alleges that "[t]he Proxy indicated that each of the members of the Board, the Individual Defendants herein, had approved the Merger."  (D.I. 60 at ¶ 79)  This is sufficient under the case law, and Defendants have not shown that each individual director needs to be identified by name as soliciting misleading proxies where, as here, the group is readily identifiable.  *See In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 525, 538 (D. Del. 2012) (finding sufficient allegations that "all of the Individual Defendants agreed to the October 30, 2008 Merger and the October 2, 2008 Joint Proxy soliciting stockholder support for the Merger.").  "Unless a director formally dissents and disassociates himself from the proxy solicitation, that director is considered to be soliciting proxies on behalf of management and thus, is liable for misstatements contained in the proxy materials."  *Id.* at 538.

21

C.     "Control Person" Claim Against Mr. Tartavull

Defendants contend that the amended complaint fails to plead "control person" liability against Mr. Tartavull under Section 20(a) of the Exchange Act.  (D.I. 66 at 19-20)  To state a claim under Section 20(a), a plaintiff must first plead "a primary violation of the federal securities laws by a controlled person."  *In re DaimlerChrysler AG Sec. Litig.*, 197 F. Supp. 2d 86, 100 (D. Del. 2002); *see also Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484–85 (3d Cir. 2013) (stating that in addition to the statutory elements, the plaintiff must show that defendant was a "culpable participant" in acts constituting a violation).  For the reasons set forth at § IV.B, *supra*, the amended complaint fails to adequately plead a violation of Section 14(a) of the Exchange Act.  Consequently, I recommend dismissal of Plaintiff's cause of action under Section 20(a).

V.     CONCLUSION

For the reasons discussed above, I recommend that the court GRANT Defendants' motions to dismiss without prejudice.  (D.I. 65; D.I. 67)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The objections and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the court's Standing Order for Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.

Dated: January 29, 2021        _____

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE