**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>MAVENIR, INC. F/K/A XURA, INC., PHILIPPE TARTAVULL, HENRY R. NOTHHAFT, SUSAN D. BOWICK, JAMES BUDGE, NICCOLO DE MASI, MATTHEW A. DRAPKIN, DORON INBAR, and MARK C. TERRELL<br><br>      Defendants. | C.A. No. 18-1229-CFC<br><br><br>**CLASS ACTION**<br><br><br><br>**JURY TRIAL DEMANDED** |

**SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

Lead Plaintiff Wayne County Employees' Retirement System ("WCERS" or "Lead Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief are based upon, *inter alia*, the investigation of Court-appointed Lead Counsel.  This investigation included, but was not limited to, the review and analysis of publicly-available information, including filings with the Securities and Exchange Commission ("SEC") and facts made public in the course of *Obsidian Management LLC* v. *Xura, Inc.*, No. 12698-VCS (Del. Ch.), which was consolidated with that plaintiff's breach of fiduciary duty claim in April 2018 (referred to herein as the "Appraisal Action" or "*In re Xura Inc. Stockholder Litig.*"). Lead Plaintiff's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by the Defendants named herein or are exclusively within their custody or control.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## NATURE OF THE ACTION

1.     This class action arises from a transaction announced on May 23, 2016 (the "Merger"), under which Sierra Private Holdings II Ltd. ("Parent") acquired Xura, Inc. ("Xura" or "the Company") through its wholly-owned subsidiary, Sierra Private Merger Sub Inc. ("Merger Sub"), both of which are affiliates of Siris Capital Group, LLC (together with Parent and Merger Sub, "Siris").

2.     This action is brought on behalf of all Xura shareholders of record as of July 11, 2016, the record date for Xura shareholders to be eligible to vote on the Merger.  The claims asserted

---

[1] A redline attached as **Exhibit A** hereto indicates the changes between the *Amended Complaint* (D.I. 60) and this *Second Amended Complaint*.

herein are alleged against Xura, Xura's former President, Chief Executive Officer ("CEO") and director, Philippe Tartavull ("Tartavull"), and the remaining members of Xura's Board of Directors (together with Tartavull, the "Individual Defendants") (collectively, "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder.

3.     On May 23, 2016, Xura's Board of Directors (the "Board" or "Individual Defendants") caused Xura to enter into an agreement and plan of Merger (the "Merger Agreement" or the "Transaction") with Siris.  Pursuant to the terms of the Merger Agreement, stockholders of Xura received $25.00 per share in cash.  The shareholders voted to approve the Merger on August 16, 2016, and the Merger closed on August 19, 2016.

4.     Prior to the shareholder vote, Defendants issued a Preliminary Proxy Statement on June 28, 2016, a Definitive Proxy Statement on July 12, 2016 (together, the "Proxy"), and Additional Definitive Proxy Materials on July 26, 2016 (the "Supplemental Proxy"), all of which Xura filed with the United States Securities and Exchange Commission ("SEC") in connection with the Merger.  The Proxy and Supplemental Proxy contained material misrepresentations and omitted material information that misled Xura stockholders regarding the sales process that led to the Merger Agreement.

5.     The Proxy presented the Transaction as one that had been negotiated at arm's length with oversight of a mostly-independent strategic committee and a leading investment banking firm, and a process in which the key Xura negotiators were free from conflict.  However, the Proxy omitted material information that suggested a heavily tainted negotiation process.

6.     In particular, the Proxy failed to disclose: (a) material communications between Tartavull and Siris, including discussions regarding certain merger terms that occurred without

2

Board authorization and that undermined Xura's negotiating leverage, (b) the fact that the committee of the Board that ostensibly was provided with extensive authority with respect to consideration of the Merger (the "Strategic Committee") played no meaningful role in the process that led to the Merger, contrary to the representations in the Proxy, (c) the fact that Siris and Tartavull repeatedly cut the Board's financial advisor, Goldman Sachs ("Goldman"), one of the world's top investment banks, out of the loop of the Merger negotiations, notwithstanding the role the Proxy claimed Goldman played in that process, (d) the fact that Xura imposed conditions on an interested bidder that all relevant participants in the process acting on behalf of the Company knew were unreasonable and unnecessary, leading it to cease further participation in the bidding, and (e) the fact that, while the Proxy emphasized purported contacts to prospective buyers and claimed that none expressed an interest in buying Xura, another potential bidder had in fact expressed such interest to Tartavull but somehow learned that Siris was Xura's counterparty—notwithstanding provisions of the non-disclosure agreement that Siris and Xura signed barring such disclosure—and instead of making a bid, reached out to Siris seeking a role as a co-investor.

7.      Additionally, the Supplemental Proxy emphasized that Xura and Siris had "not reached any agreements about the continuing employment of the executive officers of the Company." This statement was misleading because regardless of whether there had been any formal negotiations as to Tartavull's employment after the Merger, it was always clear that Siris' intent had been for Tartavull to continue in his role as CEO of the post-merger company.

8.      These material misrepresentations and omissions deprived Xura stockholders of the opportunity to make an informed decision on the Merger and caused them to accept consideration from the Merger that was well below fair value for their Xura shares.

9. Accordingly, Lead Plaintiff alleges herein that Defendants violated Sections 14(a) and 20(a) of the Exchange Act by soliciting stockholder approval of the Merger by means of false and misleading proxy materials.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Prior to the Merger, Xura was incorporated in this District, and the merged entity, which operated under the same name, continued to maintain its incorporation in this District. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12. Lead Plaintiff Wayne County Employees' Retirement System owned shares of Xura stock eligible to vote on the Merger, as set forth in the Certification previously filed with the Court, held those shares through the closing date of the Merger, exchanged those shares for the merger consideration of $25 per share, and suffered damages as a result of the violations of the federal securities laws alleged herein. In particular,

    (a)       on July 11, 2016, the record date for the shareholders of Xura to be eligible to vote on its Merger and acquisition, WCERS owned shares of Xura common stock.

    (b)       WCERS continued to hold these Xura shares through the date of the Merger closing on August 19, 2016, at which time WCERS' shares of Xura common stock were exchanged for cash consideration of $25/share in connection with the Merger.

    (c)       WCERS was damaged by the material misrepresentations and omissions in the Proxy and Supplemental Proxy, which caused Lead Plaintiff and members of the Class to approve the Merger and accept merger consideration that failed to adequately value Xura's shares, as set forth below. *See* Loss Causation section, *infra*.

13.    Defendant Xura was at all relevant times a Delaware corporation that maintained its principal executive offices in Wakefield, Massachusetts. Xura's common stock was traded on the NASDAQ Global Market exchange under the ticker symbol "MESG." After the Merger, Siris privately owned and operated Xura. On December 19, 2016, Xura announced that it had entered into definitive agreements to acquire Mitel Mobility, Inc., a division of Mitel Networks Corporation, and Ranzure Networks, Inc. Xura completed both transactions in February 2017. Upon the completion of both acquisitions, it adopted a new name, Mavenir Systems, Inc., for the new combined Company.

14.    Defendant Tartavull served as a director, President, and CEO of Xura starting in May 2012 and at all times relevant hereto, and continued in the role of CEO of Xura after the Merger

5

until December 19, 2016.  Tartavull also served as a member of the Strategic Committee.  Xura terminated Tartavull as CEO on December 19, 2016.

15.     Defendant Henry R. Nothhaft ("Nothhaft") was a director of Xura and served as Chairman of the Board starting in October 2012 and at all times relevant hereto.  According to the Company's website, Nothhaft was Chair of the Corporate Governance and Nominating Committee. Nothhaft also served as a member, and the Chair, of the Strategic Committee.

16.     Defendant Susan D. Bowick ("Bowick") served as a director of Xura starting in October 2012 and at all times relevant hereto.  According to the Company's website, Bowick was Chair of the Compensation and Leadership Committee and a member of the Corporate Governance and Nominating Committee.

17.     Defendant James Budge ("Budge") served as a director of Xura starting in October 2012 and at all times relevant hereto.  According to the Company's website, Budge was a member of the Audit Committee and the Compensation and Leadership Committee.

18.     Defendant Niccolo de Masi ("de Masi") was a director of Xura starting in November 2015 and at all times relevant hereto.  According to the Company's website, de Masi was a member of the Audit Committee and the Corporate Governance and Nominating Committee.

19.     Defendant Matthew A. Drapkin ("Drapkin") was a director of Xura starting in March 2014 and at all times relevant hereto.  According to the Company's website, Drapkin was a member of the Compensation and Leadership Committee.  Drapkin also served as a member of the Strategic Committee.

20.     Defendant Doron Inbar ("Inbar") served as a director of Xura starting in October 2012 and at all times relevant hereto.  According to the Company's website, Inbar was a member of the Audit Committee and the Corporate Governance and Nominating Committee.

21.     Defendant Mark C. Terrell ("Terrell") served as a director of Xura starting in October 2012 and at all times relevant hereto.  According to the Company's website, Terrell was Chair of the Audit Committee and a member of the Compensation and Leadership Committee.

## SUBSTANTIVE ALLEGATIONS

### I.     Background

22.     At all relevant times, Xura offered a portfolio of products and services to major telecommunications companies, digital communications services for businesses, and products that facilitated additional revenues for mobile carriers.

23.     Xura became a publicly traded company in October 2012 and began trading on the NASDAQ stock market on November 1, 2012.[2]

24.     Tartavull joined Xura in 2012 after a stint as CEO of Hypercom. When negotiating the terms of his employment contract with Xura, Tartavull "specifically put [a] term" into the contract that gave him the right to terminate his employment for good reason and trigger change-in-control payments if the Company was purchased by a private equity firm.  Accordingly, if the Company did not renew Tartavull's employment agreement (which was set to expire in May 2016) or if it fired Tartavull for cause prior to a sale to Siris, Tartavull stood to miss out on over $3 million in unvested stock options and restricted stock units, severance, and change-in-control compensation.

25.     Siris is a private equity fund that focuses on technology companies, particularly those in the telecommunications industry, that the market fails to accurately value by reason of the complex nature of their businesses.

---

[2] Xura was previously known as Comverse, Inc.  For ease of reference, throughout this Complaint, the Company is referred to as Xura.

## II.     Siri's First Contacts With Xura

26.     The August 19, 2016 acquisition of Xura by an affiliate of Siris was the consummation of a long courtship. Tartavull first met Siris' Managing Partner and one of its three founders, Frank Baker ("Baker"), in Barcelona in 2012.

27.     Tartavull sought out Siris as a potential financial sponsor for an acquisition involving Xura in October 2013. From October 2013 through November 2014, Tartavull had a series of discussions with senior Siris personnel regarding potential strategic transactions. On November 17, 2014, Tartavull had lunch with Siris Executive Partner Hubert De Pesquidoux ("de Pesquidoux") and Baker. Only three days later, on November 20, 2014, Tartavull had dinner with people from Siris. And, in late November, Siris participated in an "on-site meeting at [Xura's] headquarters in Wakefield, Massachusetts."

28.     At the time, Xura was also considering a proposal by Amdocs Limited ("Amdocs") and another bidder to purchase the Company's billing systems and support business ("BSS Business").

29.     On January 7, 2015, Siris submitted a letter of interest in which it proposed acquiring Xura for $24 per share.  Siris's offer letter indicated it "continue[d] to be impressed by the senior leadership team and [was] excited about the prospect of partnering with them." In February 2015, before the Board responded and after conducting certain due diligence, Siris reduced its offer to a range of $20 to $22 per share.  Xura declined to pursue a transaction, and on February 11, 2015, the Board rejected this proposal in light of, among other things, its determination that the sale of the BSS Business would increase Xura's enterprise and market valuation. Instead, Xura pursued a series of transformative transactions.

III.    **Xura's Transformation**

30.    In 2015, Xura embarked on a series of transactions that would transform its business. Xura was determined that the sale of the BSS Business would increase Xura's enterprise and market valuation.

31.    As the year continued, shortly after Siris' initial indication of interest, Xura had become even more attractive to Siris, developing into precisely the type of complex business that the market tended to undervalue.  In addition to the sale of its BSS Business to Amdocs, the Company entered into other transactions that transformed its business.

32.    On April 14, 2015, Xura finalized a Master Service Agreement to enter into a global strategic partnership with Tech Mahindra, which specializes in digital transformation, consulting, and business re-engineering in the global technology industry.  Pursuant to that agreement, Xura transferred 571 employees to Tech Mahindra for $211 million to be paid over six years.  Xura estimated that this would save it about $70 million over six years.

33.    On April 29, 2015, Xura finalized an asset purchase agreement to sell its BSS Business to Amdocs.  The BSS Business had accounted for approximately 53% of Xura's total revenue in FY 2014, but Xura viewed the BSS business as subcritical in scale.

34.    On August 6, 2015, Xura acquired Acision Global Limited, a leader in secure mobile messaging and engagement services based in the UK, which shortly thereafter renamed itself Xura.

35.    These transactions caused Xura to develop into precisely the type of complex business that the market tended to undervalue, resulting in Xura becoming even more attractive to Siris.

IV.  **Siris Prompts a Sale**

36.    In an offer letter to Xura, Siris expressed that "in our experience, public equity markets typically do not understand long-term, complex business transformations and remain focused on short-term performance."

37.    To potential lenders, Siris stated that Xura was "Misunderstood by Public Markets," "unappreciated," and that "transformational transactions and associated significant restructuring masks attractive financial profile."

38.    Consistent with that view, Goldman recognized that the transformational transactions that Xura had engaged in would likely leave Siris with little competition, because, as Goldman's Co-Chief Operating Officer of the Global Technology, Media and Telecom Group commented on November 28, 2015, the "[s]imultaneous closing of a massive divestiture and a reverse merger is pretty much unprecedented."  As such, the Company's complexity would make it more difficult to understand and more difficult for a buyer to "arrange institutional debt," as "the ability to make sense of a stable set of financials will be quite challenged."

39.    On October 19, 2015, Siris submitted an indication of interest to acquire the Company at a price of $30.00 to $32.50 per share.  It did so by means of a letter to Tartavull that stated in part that Siris was "excited about the prospect of working with the management team to help Xura reach its full potential," clearly reflecting an understanding that Tartavull and his management team would be retained in the event the Merger occurred.

40.    On October 21, 2015, Baker texted Tartavull for feedback on Siris' offer.

41.    On October 22, 2015, the Board met and determined to reject Siris' proposal.

42.    Undeterred, on October 30, 2015, Siris sent Tartavull another letter, increasing its offer to $35 per share, and repeating the same statement about an eagerness to work with "the

Company and its leadership team to accelerate Xura's transformation without the scrutiny and pressures of the public markets."

## V.      The Pre-Signing Process

43.     On November 5, 2015, the Board retained Goldman as the Company's financial advisor, authorizing it to continue discussions with Siris. The Proxy informed shareholders that Goldman Sachs was retained because of their unique expertise and reputation as investment bankers in advising on transactions of this nature. Goldman immediately took steps to establish a communications protocol that would ensure it stayed in the loop. At his deposition in the Appraisal Action, Krinsky explained that "it is our policy and … we think it's to the health of the client to make sure that we're involved in any communications. And if there's a communication that happens without us, we will tell the client that, you know, that shouldn't be the case and it's for their benefit."

44.     On November 19, 2015, Daniel Krinsky ("Krinsky") of Goldman asked Michael Hulslander ("Hulslander"), Siris' Vice Principal, handling the day-to-day management of the negotiation process, to "please keep me on any communications with the Company going forward."

45.     Siris consciously ignored this request.  Indeed, on November 29, 2015, Hulslander told Frank Baker ("Baker"), a managing partner at Siris, that he wanted to "make sure we have a **non-Goldman game of telephone game plan to get the remaining high priority data**."

46.     On December 2, 2015, Siris sent a letter reaffirming its offer of $35 per share and repeating that it was "excited about the opportunity of working with the Company and its leadership team to accelerate Xura's transformation without the scrutiny and pressures of the public markets."

47.     On December 3, 2015, the Board established the Strategic Committee, which was comprised of Individual Defendants Tartavull, Nothhaft, and Drapkin.  According to the Proxy, the Strategic Committee was created to "review, evaluate and negotiate the terms of a potential transaction with Siris and to make certain decisions between meetings of the board of directors."

11

Moreover, the Proxy falsely reassured shareholders that the involvement of independent directors in the merger negotiation process ensured its integrity and that the process would be free from conflict. However, the Strategic Committee was not meaningfully involved in the process that led to the Merger.  The Strategic Committee never met with Siris, never took formal action, and never kept minutes.  According to Terrell's testimony in the Appraisal Action, the creation of the Strategic Committee was nothing more than an effort to "semi formalize" Tartavull's practice of conferring with Nothhaft and Drapkin before bringing issues to the entire Board. Nothhaft described it in his testimony in the Appraisal Action as "a weekly, or more, phone call with Philippe [Tartavull]... [where] we would discuss... the most important and difficult issues that he was confronting as a CEO."  Indeed, Nothhaft did not even realize that it was a board committee, that the phone calls were "Committee meetings," or that the committee was responsible for negotiating the Merger— even though the Proxy said so and identified Nothhaft as its Chairman. Neither of the nominally "independent" Committee members had any idea how often management and Siris spoke or what they discussed.

48.     The Board permitted Tartavull to have a lead role in negotiations with Siris even though it was well known within the market that Siris "typically keep[s] management teams in place."  Notably, Tartavull knew that absent a deal, the Board would likely replace him, which made his prominent role, and Goldman's very limited role, in the negotiation process material information that a reasonable investor would have wanted to know.

49.     As the following facts make clear, Tartavull's conduct during the Transaction process confirmed his loyalty to his future employer at the expense of Xura's stockholders.

50.     Furthermore, Tartavull's financial incentives (i.e., his employment agreement and equity in Xura) did not align with Xura's stockholders. Tartavull's employment agreement was set

to expire in May 2016. According to the Appraisal Action, in the months leading up to the Merger, Tartavull and other members of Xura's Board of Directors received an avalanche of complaints from significant Xura stockholders frustrated with Tartavull's performance. Several of Xura's directors testified at their depositions in the Appraisal Action that Tartavull was in danger of losing his job. Moreover, certain directors testified that Tartavull should go. James Budge, a member of Xura's Board at the time of the Merger, testified in the Appraisal Action that he would have been willing to support looking at replacements for Mr. Tartavull. Mark Terrell, a member of Xura's Board at the time of the Merger, testified in the Appraisal Action that if [the] deal fell through, the Company would have made changes "from top to bottom" and that the Company would have to take "a hard look at everything," including CEO. (*E.g.*, an email from Xura director James Budge to Terrell stating: "Yet another bungle up by PT [Philippe Tartavull] coming on this one. I'm losing interest in trying to help him help Himself").

51.    Tartavull's prospects at Xura were grim, and he knew that his employment contract was set to expire. As noted above, when negotiating the terms of his 2012 employment contract with Xura, Tartavull "specifically put [a] term" into the contract that gave ***him the right to terminate his employment*** for good reason and trigger change-in-control payments if the Company was purchased by a private equity firm. It was plainly in Tartavull's best interest to usher in a deal so that he could trigger change-in-control payments before the expiration of his employment agreement. Notably, if Tartavull resigned for good reason in connection with a change in control, he would have been entitled to over $5 million dollars of severance pay and benefits.

52.    As noted in their offer letter to Xura, dated October 19, 2015, Siris expressed that it was "excited about the prospect of working with the management team to help Xura reach its full potential." Subsequent offer letters Siris sent in October and December 2015, and February 2016

13

confirmed that Siris was "excited about the opportunity of working with the Company and its leadership team to accelerate Xura's transformation without the scrutiny and pressures of the public markets."

53.    A sale presented Tartavull with the opportunity to reap a unique set of benefits. If he stayed on after closing, Tartavull could make $25 million in connection with a future sale. If he left, he would trigger a golden parachute severance package that would have been unavailable absent a sale.

54.    Moreover, Tartavull worked around Goldman Sachs ("Goldman"), Xura's board-selected advisor, to give Siris the inside track. Once retained, Goldman attempted to control the negotiations and flow of information between Xura and Siris with customary safeguards. But Tartavull and Siris worked around Goldman despite Tartavull's emails to other Xura employees advising that all employees (including him) work through Goldman. In fact, Tartavull was an active and conscious participant with Siris in creating a "non Goldman game" of communication, including by means of telephone, emails, texts as well as physical meetings.  At times, Tartavull attempted to ensure he was the *only* line of communication with Siris. Tartavull sought to completely exclude Goldman from the process, telling its representatives that he was already communicating with Siris and did not want "two lines of communication."  Tartavull began exchanging texts with Baker of Siris no later than October 21, 2015, two days after Siris expressed interest in acquiring Xura.  Texts between Tartavull and Baker and other Siris personnel continued until long after the closing of the Merger.  Notably, many, if not most, of those messages have been either lost or destroyed.

55.     In November of 2015, Siris and Xura extended the non-disclosure agreement that they had executed back in 2013. The non-disclosure agreements between Siris and Xura, which were not disclosed in the Proxy, *required* Siris to communicate to Tartavull:

> You agree that all (i) communications regarding the Transaction, (ii) requests for additional information, (iii) requests for facility tours or management meetings, and (iv) discussions or questions regarding procedures, ***will be submitted or directed only to the Chief (Executive Officer*** of the Company or any designee thereof (the "Designated Officer"). You further agree that, subject to paragraph 11, under no circumstances will you or your Representatives discuss or otherwise communicate any aspect of the Transaction to any member of the management of the Company ***without the express written permission*** of the Designated Officer.

56.     The undisclosed non-disclosure agreement clearly shows that Tartavull was given exclusive control of the negotiations; however, the Proxy suggests otherwise. In fact, the Proxy falsely reassured shareholders that the involvement of independent directors in the merger negotiation process ensured its integrity and that the process would be free from conflict. From reading the Proxy, shareholders would understand that both the Strategic Committee and Goldman would be involved in, or at least vet, the Merger negotiation process. In fact, unbeknownst to shareholders, Tartavull, Xura's conflicted CEO, was contractually required to be the first line of communication with Siris.

57.     During a December 15, 2015 earnings call, Tartavull lauded Xura's condition, noting: "We are extremely excited to post our strong third-quarter preliminary results, which demonstrate that we continue to execute on our strategic transformation and restructuring of the Company while positioning Xura for future growth and improved profitability."

58.     Beginning in January 2016, Xura and Siris held a series of due diligence sessions, during which Xura provided Siris with access to a due diligence room.  Tartavull and Siris repeatedly cut Goldman out of the loop during this period.  The Proxy notes that Tartavull and

Baker "discussed the status of Siris' due diligence review and the timeline for announcing a transaction" on January 7, 2016.  But neither the Proxy nor the Supplemental Proxy mentions several other conversations between Tartavull and Siris around the same time.

59.     For example, Tartavull and Baker spoke on January 25, 2016.  Goldman did not know about the conversation until Xura's CFO, Jacky Wu ("Wu"), reported it to Xura's relevant personnel.  A multitude of other communications occurred as well.  Siris even sent certain of its analyses directly to Tartavull.  These side communications alarmed Wu, who informed Goldman that "[Tartavull] had talk with frank" and asked Goldman to speak with Tartavull.

60.     Direct, unsupervised communications between Siris and Tartavull continued despite Goldman's requests that they are included in all communications between Xura and Siris. At times, Tartavull attempted to ensure that he was the only line of communication with Siris. In an email, he told Goldman that he was already communicating with Siris and did not want "two lines of communication."

61.     According to the Appraisal Action, there were many instances where Goldman did not even know that Tartavull was speaking or meeting with Siris until after it happened, or until Wu, Xura's CFO, or another member of Xura's management mentioned it. As Goldman's 30(b)(6) witness, Krinsky, testified in the Appraisal Action, he believed Goldman had been the conduit for all price negotiations. But, Krinsky also testified that Goldman was so out of the loop that they never learned that Tartavull had discussed price with Siris directly.

62.     The Proxy touted, Goldman Sachs had "substantial experience in transactions of the nature proposed." However, Goldman admitted that Tartavull's unsupervised communications with Siris were not standard practice. Krinsky testified in the Appraisal Action that "when we run processes, we like all communications to go through us versus anybody going directly to the

company." At his deposition, Hulslander admitted that Siris ignored repeated requests that Siris channel communications through Goldman.

63.     Goldman repeatedly expressed their disapproval for the backchannel communications between Tartavull and Siris. When asked about Tartavull's texts with Siris, Krinsky testified that "we don't view that as the appropriate way to communicate." At one point, Goldman scolded Siris for telling Tartavull one thing and Goldman something else. Krinsky's testimony in the Appraisal Action emphasized that Goldman should have been "the point for communication between bidders."

64.     On January 27, 2016, Goldman reached out to several potential bidders, four of which executed non-disclosure agreements.   However, Hulslander acknowledged that Siris' contacts with Tartavull gave it a "head start" compared to other participants in the process.   In contemporaneous emails, Hulslander boasted on or about February 5, 2016, that Xura was "not for sale" and Siris had a "proprietary angle" on the deal.

## VI.     The February 24 Launch and Siri's Retrade

65.     On February 18, 2016, Siris told Goldman that it intended to lower its offer to Xura. A specific price was not discussed.

66.     According to the Proxy, on February 25, 2016, Siris submitted a revised indication of interest to acquire the Company for $28.00 per share "based on the concerns identified to Goldman Sachs by Siris on February 18, 2016."  However, the Proxy completely omits discussion of a lunch meeting between Baker and Tartavull the day before that resulted in this revised offer.

67.     At this undisclosed meeting on February 24, 2016, Baker and Tartavull discussed the price of Siris' offer, timing of the Transaction, and possible M&A transactions.  Tartavull told Baker that Siris should offer $28 per share.  As noted, Siris did so one day later.  Baker later wrote

17

that the parties had "agreed" upon $28 before Siris sent the letter.  The Board, Strategic Committee, and Goldman were not informed of this meeting.

68.      The lunch meeting was a material event given the identities of the participants, the sensitivity of the topics, and the apparent correlation between the lunch meeting and Siris's $28 bid a day later.  Here, a conflicted CEO was meeting and negotiating one-on-one with Siris at a critical moment. Having partially disclosed the history leading up to a Merger, they have an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events.

69.      There were other highly sensitive communications between Tartavull and Siris that were omitted from the Proxy.  For example, in March 2016, Tartavull told Siris that Wu, Xura's CFO, told "white lies," clearly undermining Xura's negotiation position.  He suggested that Siris bring in someone to take over the CFO's responsibilities during the Transaction process.  The discussion prompted Baker to direct his team to "triple check" Xura's numbers.

70.      On March 5, 2016, Tartavull and Siris arranged a call to discuss high-priority diligence items without notifying Goldman. Wu emailed Daniel Krinsky of Goldman: "OK, apparently we have a call now with siris in 25 minutes? PT got a call from frank and mike huslander [sic] and they are setting up a call…not sure if GS knows about it…" Wu was right to check. Goldman did not know about the call. Krinsky replied: "Pass along dial-in I will be on." Wu responded in exasperation: "It's not even a dial in…Philippe is merging me in with mike huslander [sic]… **you can't make this up**." On the same day, Baker of Siris criticized his personnel for failing to send a data request list to Tartavull because he revealingly stated, "Philippe [Tartavull] is part of working team.  He needs to be in mix[.]".  In late March 2016, Wu commented that Tartavull "appears to be working directly with Siris on his own."

18

71. On March 13, 2016, a potential buyer, The Carlyle Group ("Carlyle"), provided Goldman Sachs with an indication of interest in the range of $26.00 to $27.00 per share, but said that it "still [had] a lot of work to do to confirm," given that, as Goldman noted with respect to the amount of due diligence that was required by Carlyle and other bidders, Xura was "a complicated story."

72. At this point, Xura should have worked hard to keep Carlyle in the process. Nonetheless, instructed by the Company, Goldman told Carlyle that it would need to bid $28 per share or higher and that any remaining due diligence it was engaged in would "need to be completed on an expedited time frame."

73. This communication was made despite the fact that various participants in the negotiation process for Xura fully expected that Siris would likely reduce its latest bid to below that target price, which was not disclosed in the Proxy. For example, Nothhaft admitted at his deposition in the Appraisal Action that he was skeptical of Siris' offers. Tartavull testified that he knew that Siris would likely try to lower its price because that was the "track record of every private equity [firm]." Wu testified that "[g]iven the nature of private equity and how they do business . . .it's a common tactic that they try to re-trade numbers." Further, Siris had previously lowered its bids for Xura.

74. Upon receipt of Goldman's communication, Carlyle stated that "it would not move forward in the bidding process." Thus, Xura effectively eliminated the only viable competitor to Siris in the bidding process.

75. Thereafter, on March 16, 2016, lacking any such competitor, Xura entered into an exclusivity agreement with Siris that would prevent Xura or its advisors from soliciting or

19

encouraging offers from anyone except Siris through April 8th.  At the end of that period, exclusivity would automatically renew unless Siris or Xura terminated it.

76.     During the exclusivity period, Tartavull and Siris continued to cut out Goldman from the negotiation process, which was not disclosed in the Proxy.  When Goldman acted as an information conduit, Tartavull reacted by demanding that he be copied on every request from Siris.  However, the same courtesy was not provided to Goldman, resulting in Goldman being in the dark as to material relevant facts when Siris learned of them.  For example, Siris learned information from Tartavull about a claim against the escrow account established in connection with the sale of the BSS Business to Amdocs and the claim's effects on the Company's projected cash at closing, before Goldman came into possession of those facts.

77.     When Siris complained to Jason Rowe ("Rowe") of Goldman about this development, Rowe had to ask his team about it.  Krinsky responded that it was the "first time I am hearing [it] and [it] would obviously be a significant issue."  Michael Ronen ("Ronen") of Goldman concluded: "[h]ere comes the price renegotiation ... [w]e are in exclusivity and now [S]iris will create a crisis to take price down."

78.     Certain personnel at Goldman, including Krinsky, opined that Siris might have learned the new information when Tartavull, Baker, and de Pesquidoux, a Siris Executive Partner, had dinner on March 23, 2016 an event that was never disclosed in the Proxy and that did not include Goldman.  Krinsky "question[ed] communicating such info in that forum."  This, and other instances involving information being provided to Siris before being presented to Goldman, prompted Rowe to tell Baker he could not "say one thing to me and another to [Tartavull]."

79. On March 24, 2016, Siris told Goldman it might not be able to offer more than $24 per share. Ronen concluded in an email that "[t]his is a classic case of post exclusivity price retrade. The more !!!!!!! I see in Frank's email the more obvious it is[.]"

80. On April 7, 2016, Goldman and Xura decided to implement a negotiation tactic in reaction to Siris' repeated efforts to direct the negotiations backward in terms of price. They decided to shut down communications with Siris and go "radio silent." However, hours later, Tartavull simply ignored this strategy by communicating directly with Siris. Wu reacted in an email to this turn of events by stating, "[w]e are bidding against ourselves." At his deposition, Wu testified that he believed at the time that Tartavull's contacts with Siris "undermined the company's negotiating position."

81. By this point, Tartavull knew his job, potential golden parachute exit, and potential future employment with Siris were all in jeopardy. On April 14, 2016, Notthaft informed Obsidian that "[i]f the deal does not go through there will be significant changes at the Board, and management."

82. On April 9, 2016, Siris formally submitted an indication of interest to acquire Xura for $24.75 per share. Xura capitulated to Siris' re-trading its prior higher bid, countering that Siris raise its offer price to only $25.00 per share, and the parties came to an agreement at that price.

## VII.    Francisco Partners Requests Opportunity to Bid

83. On April 15, 2016, Xura publicly announced that it was unable to timely file its 2015 Form 10-K and that it was in negotiations to sell itself for $25 per share, without mentioning the name of its counterparty. In the release, Xura blamed its financial reporting problems on the "complex strategic negotiations for the potential sale of the company."

84. Thereafter, Francisco Partners, a private equity firm focused exclusively on investments in "technology and technology-enabled services businesses," expressed an interest in

competing with the unnamed third party to acquire Xura.  Francisco Partners had previously invested in Hypercom, where Tartavull served as CEO before he joined Xura. At his deposition in the Appraisal Action, Baker listed Francisco Partners as one of the most logical parties to contact.

85.     Keith Geeslin, a partner at Francisco Partners, told Tartavull that "if Xura is going to be sold, FP would appreciate the opportunity to bid." Internally, Francisco Partners acknowledged that Tartavull might not want them to enter the process ("***We know each other pretty well, but he's good at doing just what is in his interest.***").

86.     Francisco Partners was right to be suspicious. On April 20, 2016, Tartavull covertly informed Baker via text message: "***We got interest in the [C]ompany by another party[.] We are respecting our exclusivity[.] Call me when you have time[.]***" Baker, in turn, contacted Francisco Partners. (April 22, 2016 text message from Baker to Ben Ball of Francisco Partners: "It's frank Baker. I just called u. Call me back when u can."). Over the following weeks, Siris communicated with Francisco Partners on multiple occasions, and the two firms even met in person the week *before* Siris and Xura signed the merger agreement.  Via Siris, Francisco Partners obtained material, non-public information about Xura and the merger process. ("They were supposed to sign last week, but that didn't happen"). At his deposition in the Appraisal Action, Tartavull claimed to have had no knowledge of these communications. But Tartavull knew ***because Baker told him***.

87.     Francisco Partners somehow learned that Siris was Xura's counterparty, notwithstanding the mutual non-disclosure agreement that Xura and Siris signed barring such disclosure.  Instead of submitting a competing proposal, Francisco Partners reached out to Siris about a potential co-investment on the buy-side of the Transaction.  Xura eventually approved of Francisco Partners as a financing source, though later, Siris and Francisco Partners failed to agree upon the terms of a co-investment agreement.

88.     The Proxy never mentioned that one of the parties contacted refused to participate in the go-shop because it sought to co-invest with Siris, nor did the Proxy mention that Xura ultimately approved that possible co-investment. The omission of Francisco Partners tripped Xura's expert, in the Appraisal Action, who emphasized (wrongly) in his report that, "[d]uring the five-week period between [the announcement that Xura was in negotiations for a sale at $24 per share] and the execution of the Merger Agreement with Siris on May 23, 2016…no other party expressed an interest in buying Xura."

89.     The Proxy made no mention of Francisco Partners whatsoever - even though Tartavull had added his communications with Francisco Partners to a draft of the Proxy. Tartavull knew these discussions were important. But the parties decided not to include them in the final version.

90.     Around this time, Siris and Tartavull continued their conversations regarding potential add-on acquisitions; Tartavull consulted with Siris about the price to offer for a proposed acquisition of Adaptive Motive. This alarmed Wu and Terrell, and Wu questioned whether it was consistent with their "current fiduciary responsibility." (April 28, 2016 email from Wu to directors Terrell and Budge stating: "You're not wrong .. *this is not right and clearly not in alignment with our current fiduciary responsibility*. *We do not work for Siris* ... unless they are willing to sign and close the deal, then we have to do what is right for our current shareholders.") (emphasis added).

91.     On May 22, 2016, the Board approved the agreement to sell Xura to Siris for $25 per share, and the parties executed the Merger Agreement on the following day.  It also announced the Merger on May 23, 2016.

## VIII.   Xura Conducts A Flawed Go-Shop

92.     The Merger Agreement contained a termination fee of 2% of the merger consideration during a forty-five day go-shop period and 3.5% after the go-shop period.

93.     This length of time failed to account for the difficulties competing bidders would likely have in navigating the complexities of Xura's business, which was in the midst of transformation.  As Baker acknowledged, "Xura was a super complicated business."

94.     Further, the other potential bidder, Francisco Partners, had already been sidelined, presaging the reaction of other bidders once Siris' identity as the successful bidder became known. As Tartavull admitted in his testimony, "since Siris was engaged, I don't think they want to go to battle seriously in a go-shop."  Some of Xura's directors never even knew about Francisco Partners' expression of interest, let alone Tartavull's authorization for Francisco Partners to join Siris on the buy-side of the deal. *See, e.g.*, Terrell's deposition testimony in the Appraisal Action (Q. "Did Xura ever contact Francisco Partners in connection with Xura's sale process?" A. "I have no idea.")

95.     Tartavull fed Siris confidential updates during the go-shop period, including the names of the alternative bidders with whom Xura was communicating and details regarding Xura's negotiations with them. The complexities of Xura's mid-transformation business required other potential acquirers to scramble in order to understand Xura's financials to submit a bid by the end of the go-shop period—the length of which Tartavull determined himself. (*See, e.g.,* a May 5, 2016 email stating that the length of the go-shop "is a business decision for Philippe to make").

96.     On June 15, 2016, Goldman confirmed that there were no active participants in the go-shop. Goldman reported that Marlin Equity Partners and Vector Capital had declined to participate because of the "complicated history of the asset, current performance and the potential break fees."

97.     The allegations above generate a reasonable inference that Tartavull's concern over losing his job impelled him to usher in the deal with Siris. Tartavull was so desperate to finalize the deal with Siris and preserve his employment or compensation that he lied to stockholders about his

communications. On June 3, 2016, Carl Berg, a large shareholder of Xura stock and the owner of Obsidian, asked Tartavull how frequently he met with Siris. Tartavull claimed that he had had a single, one-on-one dinner and had never had any discussions with Siris about staying at Xura. Afterward, Wu wrote to Berg: "Think you got him freaking out. He has tried to call me and [L]uke right after since he knows he has talked to [Si]ris."

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

98.    On June 28, 2016, Xura filed with the SEC a Preliminary Proxy Statement on Form PREM14A, which included the Merger Agreement, and mailed it to shareholders.  On July 12, 2016, it did the same with a final version of the Definitive Proxy Statement, on Form DEFM14A, which repeated the representations relevant to the claims herein (together, both documents have been and are referred to herein as the "Proxy").  The Proxy indicated that each of the members of the Board, the Individual Defendants herein, had approved the Merger.

99.    However, the Proxy contained a number of material misrepresentations and omissions.

100.    From reading the Proxy, shareholders would understand that the Strategic Committee and Goldman would be involved in, or at least vet, the Merger negotiation process.  The Proxy falsely reassured shareholders that the involvement of independent directors in the merger negotiation process ensured its integrity and that the process would be free from conflict to obtain the best possible financial result, and that Goldman's involvement and expertise would ensure that the process would be handled professionally and in the best interests of Xura and its shareholders. In fact, unbeknownst to shareholders, Xura and Siris entered into a non-disclosure agreement, which was not disclosed in the Proxy, the terms of which, *required* Siris to communicate to Tartavull.

101.    Unbeknownst to shareholders, Tartavull, Xura's conflicted CEO, was contractually required to be the first line of communication communicate with Siris and given free rein to handle the negotiations, cutting out both the other members of the Strategic Committee and Goldman.

102.    Furthermore, at the time of the Proxy's issuance, all the members of the Board of Directors knew or should have known that Tartavull had an obvious conflict of interest. In light of this, all the members of the Board of Directors knew or should have known that Tartavull should not serve as the exclusive conduit for key information. Yet, all the Board of Directors allowed Tartavull, Xura's conflicted CEO, to enter into a contract in which he was required to be the first in line to communicate with Siris and given free rein to handle the negotiations. The Proxy's omission of the non-disclosure agreement from the Proxy was materially misleading. Stockholders had no idea that Tartavull, a conflicted CEO, was driving negotiations through one-on-one communications with Siris at critical junctures, without any meaningful safeguards in place. The Board had an obligation to tell them in the Proxy materials.

103.    According to the Proxy, the Strategic Committee was created to "review, evaluate and negotiate the terms of a potential transaction with Siris and to make certain decisions between meetings of the board of directors."

104.    There are references in the Proxy to Tartavull having discussions with the Strategic Committee regarding Siris' proposals. Specifically, the Proxy references Tartavull "informally contact[ing]" the Strategic Committee to discuss Siris' proposals on February 25, 2016, and April 9, 2016.

105.    These disclosures were misleading and incomplete to the extent they make it appear as though the Strategic Committee was involved in the process that led to the Merger when, in reality, the Strategic Committee played no meaningful role in the process that led to the Merger.

The Strategic Committee was not meaningfully involved in the process that led to the Merger whatsoever. As noted, the Strategic Committee never met with Siris, never took formal action, and never keptminutes. Nothhaft described it in his testimony in the Appraisal Action as "a weekly, or more, phone call with Philippe [Tartavull]... [where] we would discuss... the most important and difficult issues that he was confronting as a CEO."  Indeed, Nothhaft did not even realize that it was a board committee.

106.    The Proxy also explained that the Strategic Committee was comprised of Xura's Chairman Nothhaft, Chair of the Strategic Committee, and Drapkin, as well as Tartavull.  The Proxy elsewhere identified Nothhaft and Drapkin as Independent Directors and that Tartavull was not an Independent Director. The Proxy set out in detail the significance of independent directors:

**Director Independence**

**Our board of directors currently has seven independent directors out of eight, with all members of the board other than our Chief Executive Officer qualifying as independent directors. The following members of the board of directors qualify as independent under our independence standards: Ms. Bowick and Messrs. Budge, Drapkin, De Masi, Inbar, Nothhaft and Terrell. Mr. Tartavull does not qualify as an independent director due to his employment as our President and Chief Executive Officer.** In the course of the board's determinations regarding independence, it considered the arrangements discussed under "Transactions with Related Parties."

**Our board of directors has adopted standards for determining whether our directors are independent. Under our Corporate Governance Guidelines & Principles, for a director to be considered independent, he cannot be an officer or employee of our Company and the board of directors must affirmatively determine that the director lacks a "material relationship" with us (either directly or as a partner, controlling stockholder or executive officer of an organization that has a material relationship with us) and with members of our senior management team. A "material relationship" is defined as a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.**

\* \* \*

27

**In addition to the independence standards set forth above, each director is expected to act with integrity and to adhere to the policies set forth in the Code of Conduct.** Under the Corporate Governance Guidelines & Principles, any waiver of the requirements of the Code of Conduct for any director or executive officer must be approved by the board of directors and promptly disclosed on our website.

**Under the Corporate Governance Guidelines & Principles, directors have a personal obligation to disclose actual or potential conflicts of interest** to the Corporate Governance & Nominating Committee and (a) where the roles of Chairman and Chief Executive Officer are combined or the Chairman is a non-independent director, the Independent Lead Director, or (b) where the Chairman of the Board is independent, the Chairman, prior to any board decision related to the matter and, if in consultation with legal counsel it is determined a conflict exists or the perception of a conflict is likely to be significant, to recuse themselves from any discussion or vote related to the matter.

107.     Thus, the Proxy made clear that it imposed strict ethical standards for its directors. By creating a Strategic Committee controlled by two independent directors (Nothhaft and Drapkin) and headed by the Nothhaft, Xura's Chairman, the Proxy falsely reassured shareholders that the involvement of independent directors in the merger negotiation process ensured its integrity and that the process would be free from conflict. From reading the Proxy, shareholders would understand that the Strategic Committee would be involved in, or at least vet, the Merger negotiation process. Instead, the Strategic Committee was nothing more than a sham, window dressing to reassure shareholders. In fact, unbeknownst to shareholders, Tartavull, Xura's conflicted CEO, was given free rein to handle the negotiations, cutting out both the other members of the Strategic Committee and Goldman. At the time of its issuance, all the Strategic Committee members knew or should have known that the statements about the Strategic Committee in the Proxy were false.

108.     Furthermore, the Proxy informed shareholders that Goldman Sachs was retained because of their unique expertise and reputation as investment bankers in advising on transactions of this nature. The Proxy touted the engagement of Goldman Sachs as "the Company's financial

28

advisor." Further, the Proxy explicitly agreed to "engage Goldman Sachs as the Company's financial advisor, noting that Goldman Sachs is an internationally recognized investment banking firm with substantial experience in transactions of the nature proposed as well as in acting as an advisor for the Company."

109.   It was materially misleading for Defendants to tout Goldman Sachs as Xura's "financial advisor," and that it led or managed the price negotiations with Siris when, in reality, Goldman Sachs was intentionally cut out of the price negotiations and merger conversations by Tartavull, a conflicted CEO. In fact, Xura's "financial advisor" disapproved of how Xura, and specifically Tartavull, were conducting negotiations and merger conversations.

110.   The Proxy disclosed certain communications between Tartavull and Siris but negligently failed to disclose numerous other material ones about which Defendants were aware. For example, the Proxy states that Siris advised Goldman on February 18, 2016, that it "intended to submit a revised indication of interest based on the negative findings in the due diligence Siris had conducted since its December 2, 2015 letter" and indicates that on February 25, 2016, Siris sent the revised non-binding indication of interest in the amount of $28 per share.

111.   Notably, the Proxy fails to mention the material fact that Tartavull and Baker met on February 24, 2016, the day before Siris submitted the revised indication of interest, and discussed the Transaction price, deal timing, and potential acquisitions. In fact, Tartavull himself recommended the price that Siris bid one day later. This information was material because of Tartavull's conflicting interest in having the deal go through, as described herein. Instead, Xura disclosed a narrative that gave the wrong impression: that Goldman and the Strategic Committee led the process, that the Board of directors adhered to strict ethical standards, and that Tartavull and Siris spoke far less about fewer topics than discovery in the Appraisal Action revealed.

29

112.    Further, the Proxy failed to disclose instances in which Tartavull directly undermined the negotiating strategy agreed to by Goldman and the Board.

113.    The Proxy disclosed certain communications that Goldman had with Siris, including communications on November 24, 2015, December 1, 2015, December 7, 2015, January 7, 2016, January 19, 2016, February 18, 2016, March 24, 2016, April 6-9, 2016, and April 12, 2016, related to price terms, due diligence areas, and other Merger issues, leading to the false impression that Goldman was heavily involved in the negotiation process.

114.    Defendants knowingly omitted material information with respect to the process and events leading up to the Proposed Transaction. The Proxy stated that "[f]rom April 6, 2016, through April 9, 2016, at the direction of the Company, representatives of Goldman Sachs held discussions with Siris regarding pricing."). To any stockholder that read the Proxy, Goldman appeared to be responsible for negotiating the price with Siris after its retention.

115.    These disclosures were materially false and misleading because they omit the fact that Tartavull and Siris had numerous discussions without Goldman, during which Tartavull told Siris facts material to the negotiations before Goldman learned of them.  They also omit the efforts by both Tartavull and Siris to exclude Goldman, communications and efforts which Goldman acknowledged were improper, and the instances in which Tartavull directly undermined the negotiating strategy to which Goldman and the Board agreed.

116.    According to the Proxy, the Strategic Committee was created to "review, evaluate and negotiate the terms of a potential transaction with Siris and to make certain decisions between meetings of the board of directors."  The Proxy references Tartavull "informally contact[ing]" the Strategic Committee to discuss Siris' proposals on February 25, 2016, and April 9, 2016.  There are also references in the Proxy to Tartavull having discussions with the Strategic Committee as to

30

Siris' proposals.  These disclosures were misleading and incomplete to the extent they make it appear as though the Strategic Committee was involved in the process that led to the Merger when, in reality, the Strategic Committee played no meaningful role in the process that led to the Merger.

117.    The Proxy disclosed Carlyle's (referred to as the remaining potential buyer) indication of interest, at a range of $26-27 per share, subject to more due diligence, the response that Goldman provided to Carlyle at the Company's instruction, including Xura's insistence that it makes a bid at $28 per share or higher and do so promptly, and Carlyle's resulting departure from the bidding process.  These disclosures painted a misleading picture of the reasonableness of Xura's response to this competing bid, given the omission from the Proxy of various Xura participants' views that Siris would likely bid below $28 per share and that Xura was a "super complicated business" requiring additional time to understand.

118.    Xura's Proxy disclosures never mentioned Francisco Partners.  Instead, the Proxy stated that Xura contacted "26 prospective buyers" and that "[n]one of the parties contacted during the go-shop process . . . submitted an Acquisition Proposal to the Company."  This information was misleading and incomplete because it failed to disclose the fact that one of the prospective buyers refused to participate in the go-shop because it was diverted to the buy-side of the Transaction. In addition, the Proxy failed to disclose the fact that Xura ultimately approved that possible co-investment.

119.    The Proxy never mentioned that one of the parties contacted refused to participate in the go-shop because it sought to co-invest with Siris, nor did the Proxy mention that Xura ultimately approved that possible co-investment. The omission of Francisco Partners was misleading and material. Indeed, as noted, at his deposition in the Appraisal Action, Baker listed Francisco Partners as one of the most logical parties to contact. Even Tartavull knew his

communications with Francisco Partners were important, and he included them in a draft of the Proxy. But the parties decided not to include them in the final version.

120.    On July 26, 2016, Xura filed the Supplemental Proxy with the SEC on Form DEFA14A and mailed it to shareholders.

121.    The Supplemental Proxy emphasized that Xura and Siris had "not reached any agreements about the continuing employment of the executive officers of the Company." This was materially misleading because regardless of whether there had been such formal negotiations as to Tartavull's employment after the Merger or any agreements had been reached, it was always clear that Siris' intent had been for Tartavull to continue in his role as CEO of the post-merger Company. For example, in each of Siris' proposals, it noted that it looked forward to working with Xura's then-current leadership team "to accelerate Xura's transformation without the scrutiny and pressures of the public markets." It was also well known within the market that Siris "typically keep[s] management teams in place," as stated in a Goldman document produced in the Appraisal Action. Indeed, Siris' Baker testified in the Appraisal Action that by no later than March 2016, it was clear that Tartavull would be CEO of the post-merger company.

122.    The Proxy was also false for failing to disclose that Tartavull was significantly conflicted: he knew he was likely to lose his job if he did not finalize a deal with Siris and that he needed to stay on to have a chance to obtain a $25 million LTIP package or to obtain a $4 million golden parachute. To ensure the result he wanted – a sale of Xura to Siris - Tartavull took complete control of the merger negotiations, to the exclusions of both Goldman and the Strategic Committee, worked with Siris to provide them with inside information and negotiation strategy, thwarted the interest of Francisco Partners in Xura, and lied to at least one large Shareholder.

123.     Notably, in the Appraisal Action, which had been consolidated with a breach of fiduciary duty claim, the Chancery Court found that the plaintiff adequately pled disclosure violations based on substantially similar allegations pertaining to the material misstatements and omissions alleged herein.

124.     In particular, the Chancery Court stated:

> From the public disclosures provided to Xura stockholders, it is reasonably conceivable that stockholders lacked the following material information when they voted to approve the Transaction: (1) Tartavull and Siris regularly communicated regarding the Transaction in private without the knowledge or approval of the Board or Goldman; (2) Tartavull and Baker negotiated price terms directly without Board approval, and Tartavull advised Siris what offer the Board would accept; (3) Siris made clear its intention to work with management (including Tartavull) after consummation of the Transaction in all of its offer letters to the Company; (4) the Strategic Committee did not do the work attributed to it in the Proxy; (5) Francisco Partners initially expressed interest in offering a superior bid but somehow learned that Siris was Xura's counterparty and ten moved its financial support to the buy-side of the Transaction; [. . .] and (7) Tartavull received word from Nothhaft during negotiations with Siris that his position at Xura was in jeopardy if the Company was not sold.

*In re Xura, Inc.*, *Stockholder Litig.*, 2018 WL 6498677, at *12 (Del. Ch. Dec. 10, 2018). The Court concluded that "Plaintiff has pled facts supporting a reasonable inference that stockholder approval of the Transaction was uninformed." *Id.* at 13.[3]

### DEFENDANTS SPOLIATED POTENTIAL EVIDENCE

125.     According to filings in the Appraisal Action, messages between and amongst Tartavull, Baker, and Hulslander regarding the Merger have allegedly been lost or destroyed. *See In re Xura, Inc. Stockholder Litigation*, 2018 WL 6498677, at *9 (Del. Ch. Dec. 10, 2018).

---

[3] Notably, the related Appraisal Action settled on the eve of trial after full discovery had taken place without disclosing the settlement's terms.

126.     Tartavull was under a continuing duty to preserve documents no later than May 30, 2016, when Xura received a litigation demand letter relating to the Merger.  *Id.*

127.     Tartavull used multiple phones during the Merger negotiations, one of which he turned over to Xura when he departed in December 2016.  *Id.*

128.     Xura restored the factory settings on that phone and wiped its data.  *Id.*

129.     Baker initially indicated in the Appraisal Action that he damaged his Blackberry in March 2017 but later stated that he disposed of it after it stopped working.  In January 2018, he found the Blackberry in a ski bag, but Baker claims he cannot remember the password.  *Id.*

130.     Hulslander inadvertently "cleared" his phone in June 2017 after incorrectly entering the password too many times, thereby triggering a feature that automatically wiped the data from memory.  *Id.*

## LOSS CAUSATION

131.     The false and misleading Proxy and Supplemental Proxy were an essential link in the chain of events leading to the Merger, and in proximately causing damages to Class members, because the shareholder approval of the Merger could not have been obtained without the false and misleading Proxy and Supplemental Proxy.  Defendants made material misrepresentations and omitted material facts, including, without limitation, the following: (a) Tartavull's extraordinary and inappropriate role in the Merger negotiations, (b) the manner in which the Board and the Strategic Committee played an inconsequential role and was often undercut by Tartavull, (c) the extent to which Goldman was (or was not) involved in the negotiation process, (d) the forcing out of the bidding process a competing bidder for reasons that were unreasonable, based on facts and understandings not disclosed in the Proxy, (e) the failure to disclose a potential competing bidder's interest in Xura, and its diversion to a co-investor role with Siris, and (f) the misleading statements as to Tartavull's conflicting interests.  These material misrepresentations and omissions caused

Lead Plaintiff and members of the Class to approve the Merger and accept merger consideration that failed to adequately value Xura's shares. As a result of their holdings of Xura shares at the record date, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

132.     Plaintiff in the Appraisal Action submitted the opinion of Professor Gregg Jarrell of the University of Rochester, who opined that at the time of the Merger, shares of Xura common stock were valued at $27.67 per share. Accordingly, Plaintiff alleges that Plaintiff and the remainder of the Class were damaged by at least $2.67 per share.

## CLASS ACTION ALLEGATIONS

133.     Lead Plaintiff brings this action individually and as a class action on behalf of all similarly situated holders of Xura common stock who were harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

134.     This action is properly maintainable as a class action under Federal Rules of Civil Procedure 23(b)(3) because the common questions set forth below predominate over questions affecting individual members.

135.     The Class is so numerous that joinder of all members is impracticable. As of the close of business on Xura's record date—July 11, 2016—over 25 million shares of Xura common stock were outstanding and entitled to vote on the Merger, which was held by approximately 3,093 holders of record.

136.     Questions of law and fact common to the members of the Class predominate over questions which may affect individual Class members, including:

    a.   Whether Defendants violated the Exchange Act;

    b.   Whether Defendants omitted or misrepresented material facts;

    c.   Whether Defendants acted negligently when they omitted or misrepresented material facts;

    d.   Whether Defendants' conduct caused the members of the Class to sustain damages; and

    e.   The extent of damage sustained by Class members and the appropriate measure of damages.

137.    Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' same wrongful conduct.

138.    Lead Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

139.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

140.    Xura's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

141.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, Defendants were aware that the statement was false or misleading and the statement was authorized or approved by an executive officer of Xura who knew that the statement materially misrepresented information and omitted material information.  None of the historical or present tense statements made by Defendants were

assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## CAUSES OF ACTION

### COUNT I

### Claim for Violation of Section 14(a) of the Exchange Act, and Rule 14a-9 Promulgated Thereunder Against Xura and the Individual Defendants

142.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

143.    The Defendants disseminated the false and misleading Proxy and the Supplemental Proxy, which contained statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, in light of the circumstances under which they were made, misstated material facts and omitted to state material facts necessary to make the statements therein not materially false or materially misleading.

144.    By means of the Proxy and the Supplemental Proxy, each of the Defendants sought to secure the approval of the Merger from Lead Plaintiff and other Class members and solicited proxies from Lead Plaintiff and other Class members.

145.    The Proxy and the Supplemental Proxy were prepared, reviewed, and disseminated by the Defendants.  By virtue of their positions within Xura, the Individual Defendants were aware of the material information and their duty to disclose material information in the Proxy and the Supplemental Proxy and acted on behalf of Xura.

146.    The Defendants were negligent in filing the Proxy and the Supplemental Proxy with these materially false and misleading statements and omissions.

147.    The omissions and false and misleading statements in the Proxy and the Supplemental Proxy were material in that a reasonable stockholder would consider them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

148.    The Proxy and the Supplemental Proxy were essential links in the accomplishment of the Merger.  As a result of these solicitations, Xura's stockholders approved the Merger.

149.    As a result of the materially false and misleading statements and omissions, Lead Plaintiff and the Class were damaged.

150.    By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

## COUNT II

### Claim for Violation of Section 20(a) of the Exchange Act Against Tartavull

151.    Lead Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

152.    Tartavull acted as a controlling person of Xura within the meaning of Section 20(a) of the Exchange Act.  By virtue of his position and participation in, as well as his awareness of Xura's operations or intimate knowledge of the false statements contained in the Proxy and the Supplemental Proxy, Tartavull had the power to directly or indirectly control, and did influence and control, Xura's decision making, including the content and dissemination of the Proxy and

Supplemental Proxy, which Lead Plaintiff contends materially misrepresented information and omitted material information.

153.    Tartavull had unlimited access to copies of the Proxy and the Supplemental Proxy prior to or shortly after they were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

154.    As set forth above, Tartavull had the ability to exercise control over and did control persons who violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

155.    As a direct and proximate result of Tartavull's conduct, Lead Plaintiff and the Class were harmed.

156.    By virtue of his position as a controlling person, Tartavull is liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for judgment and relief as follows:

A.  Determining that this action is a proper class action under Federal Rules of Civil Procedure 23, appointing Lead Plaintiff as Class Representative, and approving Lead Plaintiff's selection of Liaison Counsel and Co-Class Counsel for the Class;

B.  Awarding all damages and other remedies set forth in the Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

C.  Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, as well as Rule 14a-9, promulgated thereunder;

D.  Awarding Lead Plaintiff the costs of this action, including a reasonable allowance for Lead Plaintiff's attorneys' and experts' fees; and

E.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: April 30, 2021

Respectfully Submitted,

**dELEEUW LAW LLC.**

/s/ *P. Bradford deLeeuw*
P. Bradford deLeeuw (Del. Bar No. 3569)
1301 Walnut Green Road
Wilmington, Delaware 19807
Tel.: (302) 274-2180
Email: brad@deleeuwlaw.com

*Liaison Counsel for Lead Plaintiff and the Class*

**THORNTON LAW FIRM**
Guillaume Buell (*pro hac vice*)
1 Lincoln Street
Boston, Massachusetts 02111
Tel.: (617) 720-1333
Email: gbuell@tenlaw.com

**KIRBY MCINERNEY LLP**
Peter S. Linden (*pro hac vice*)
Ira M. Press (*pro hac vice*)
250 Park Avenue, Suite 820
New York, New York 10177
Tel.: (212) 371-6600
Email: plinden@kmllp.com
        ipress@kmllp.com

*Co-Lead Counsel for Lead Plaintiff and the Class*

**ALLEN BROTHERS, PLLC**
James P. Allen, Sr.
400 Monroe Street, Ste. 620
Detroit, MI 48226
Tel.: (313) 962-7777
Email: jamesallen@allenbrotherspllc.com

*Additional Counsel for Lead Plaintiff*

40