IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WAYNE COUNTY EMPLOYEES
RETIREMENT SYSTEM, on behalf of
itself and all other similarly situated,

        *Plaintiff,*

    v.

MAVENIR, INC., formerly known as
XURA, INC., PHILIPPE TARTAVULL,
HENRY R. NOTHAFT, SUSAN D.
BOWICK, JAMES BUDGE, NICCOLO
DE MASI, MATTHEW A. DRAPKIN,
DORON INBAR, MARK C. TERRELL,

        *Defendants.*

No. 1:18-cv-01229-SB

---

Peter Bradford deLeeuw, DELEEUW LAW LLC, Wilmington, Delaware; Guillaume Bell, THORNTON LAW FIRM LLP, Boston, Massachusetts; Peter S. Linden, Ira M. Press, KIRBY MCINERNEY LLP, New York, New York.

        *Counsel for Plaintiff.*

John Leonard Reed, Peter H. Kyle, Kelly Lynne Freund, DLA PIPER LLP, Wilmington, Delaware.

    *Counsel for Mavenir, Inc., James Budge, Susan D. Bowick, Niccolo De Masi,*
        *Doron Inbar, Henry R. Nothhaft, and Mark C. Terrell.*

John Leonard Reed, Peter H. Kyle, Kelly Lynne Freund, DLA PIPER LLP, Wilmington, Delaware; Rudolf Koch, RICHARDS, LAYTON & FINGER, PA, Wilmington, Delaware.

        *Counsel for Philippe Tartavull.*

Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington Delaware; Jennifer L. Conn, GIBSON DUNN, New York, New York; John Leonard Reed, DLA PIPER LLP, Wilmington, Delaware.

        *Counsel for Matthew A. Drapkin.*

March 30, 2022

**MEMORANDUM OPINION**

BIBAS, *Circuit Judge*, sitting by designation.

Parties cannot squeeze wrongdoing into any legal box they please. Tort law is one thing; securities regulation, another. Here, shareholders say a CEO misbehaved by pushing a deal that sold their company. Maybe so. But they sue under a law that punishes only material omissions or misleading statements. Because they cannot flag any such omission or statement, I dismiss their claims with prejudice.

## I. BACKGROUND

On this motion to dismiss, I take the complaint's factual allegations as true. Xura (now Mavenir) was a publicly traded telecommunications company. Second Am. Compl., D.I. 87 ¶ 23. In January 2015, it attracted a private equity fund, which flirted with the idea of buying the company. *Id.* ¶ 29. Yet Xura rebuffed those advances, insisting that it was worth more. *Id.* Instead of going private, Xura reinvented itself: it reorganized its staff, sold a weak part of its business, and bought another company. *Id.* ¶¶ 30–35.

After watching Xura's makeover with interest, the Fund decided to have another go at buying the company. *Id.* ¶¶ 35–37. So it upped its offer by roughly fifty percent. *Id.* ¶¶ 29, 42. This time, Xura's managers wanted to back the sale. But because Xura was a public company, the shareholders needed to approve it. To ensure that the sale went through, Xura's managers asked the shareholders to let them vote on the

2

shareholders' behalf. In legalese, the mangers asked to be proxies for the shareholders. But before that could happen, the company had to issue a "proxy statement" informing the shareholders of the looming vote. 17 C.F.R. § 240.14a-9(a).

Fast-forward a few months, and the sale went through. Xura shareholders got twenty percent above the market price for their shares and the Fund got the company. But then the shareholders learned that the CEO might have misbehaved when negotiating the sale. Their suspicions were aroused because the CEO would benefit if the sale went through. His contract was up for renewal, yet he was on thin ice with the Board. Second Amend. Compl. ¶¶ 50–51. So if Xura did not sell, he risked losing his job. *Id.* ¶ 51. On the other hand, if Xura did sell, he stood to get millions in severance pay, bonuses, and other benefits. *Id.* ¶ 24.

The shareholders worried that these incentives had driven the CEO to force the sale through, no matter how bad it was. And they thought he had undermined Xura's position by:

- negotiating directly with the Fund, *id.* ¶¶ 65–69;
- sidelining Xura's financial advisor and "Strategic Committee" from those talks, *id.* ¶¶ 58, 103–05; and
- failing to pursue other buyers seriously, *id.* ¶¶ 117–18.

So the shareholders sued Xura and some of its managers. They charged that the earlier proxy statements were false, misleading, or omitted key facts. *See generally id.* ¶¶ 98–124. Had the statements been otherwise, they stressed, they would have

3

demanded more money for their shares. This Court dismissed their claims a year ago. D.I. 79, 86.

The shareholders now return with their third complaint. Once more, they face a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). Because they have not cured their earlier mistakes, I dismiss their claims. And because this is their third strike, I do so with prejudice. *Alston v. Parker*, 363 F.3d 229, 235–36 (3d Cir. 2004) (allowing dismissal with prejudice when amendment would be futile or inequitable).

## II. THE SECURITIES CLAIMS FAIL

To survive this motion, the shareholders must identify either:

- a false or misleading claim in the proxy statement about a material fact; or
- a material omission that makes the proxy statement false or misleading.

15 U.S.C. § 78n(a)(1); 17 C.F.R. § 240.14a-9(a). Thus, while the law bans some omissions, it does not call for "total disclosure." *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 705 (3d Cir. 2020). Otherwise, proxy statements would be tomes.

The shareholders tear the proxy statement apart, claiming its statements are false or misleading. Yet none is. So the shareholders cannot state a claim.

First, the shareholders complain that the proxy statement said Xura had formed a strategic committee to review the deal. Second Am. Compl. ¶ 116. Yet Xura did create such a committee. *Id.* ¶ 47. So the statement was true.

The shareholders respond that the statement was misleading because it gave the false impression that the committee played a meaningful role in the deal. *Id.* ¶ 105.

4

True, the committee did not take the lead in the talks. But the statement never hinted that it had. On the contrary, the proxy statement stressed that the Board "authorized the *manage[rs]*," not the committee, "to continue discussions with" the Fund. D.I. 92 (emphasis added), Ex. A at 29; *see also Guidotti v. Legal Helpers Debt Resol.,* 716 F.3d 764, 772 (3d Cir. 2013) (letting me consider "undisputedly authentic documents" integral to the complaint). Indeed, the proxy statement referred to the committee only three times. D.I. 92, Ex. A. Nobody who read it could reasonably conclude that the committee played a major role in the deal. So the statement introducing the committee is not misleading.

Next, the shareholders wrangle over a related list of members of the strategic committee. Second Am. Compl. ¶¶ 106–07. Elsewhere, the proxy statement touted the independence of some of these members. *Id.* So the shareholders say that statement lulled them into believing in the "integrity" of the "negotiations." *Id.* ¶ 107. But the proxy statement disclosed that the committee included the CEO. *Id.* ¶ 106. And it reminded readers that he might be conflicted. D.I. 92, Ex. A, at 39. So this statement was not misleading either.

The same is true of the shareholders' next claim. They highlight language informing them that Xura hired a financial advisor, Goldman Sachs. Second Am. Compl. ¶¶ 108–109. That language, say the shareholders, never mentioned that the CEO had sidelined Goldman in the negotiations. *Id.* Indeed, they say, Xura and the Fund agreed that all communication would flow through Xura's CEO, bypassing Goldman. *Id.* ¶ 55. Maybe so. But the proxy statement did not oversell the role that Goldman

5

played. Indeed, it clarified that Goldman was not included in every communication. D.I. 92, Ex. A, at 32. Plus, the shareholders concede that Goldman interacted with the Fund many times. Second Am. Compl. ¶¶ 72, 113. So the explanation that Xura had hired Goldman was not misleading.

The shareholders next target the CEO himself. They argue that the proxy statement never said that he would win millions if Xura sold to the Fund. *Id.* ¶ 122. Yet this ignores the proxy, which warned that "executive officers … may have interests in the merger." D.I. 92, Ex. A at 4, 39. And it explained those "interests" in detail. *Id.* at 49–51, 120–21.

Alternatively, the shareholders fault the proxy for saying that the Fund had not agreed to retain Xura's leadership. Second Am. Compl. ¶ 121. That was misleading, they claim, because the Fund always intended to keep the CEO. *Id.* But intent is one thing; agreement, another. Plus, the Fund did *not* retain Xura's old CEO. *Id.* ¶ 14. So the proxy statement was neither false nor misleading.

Next, the shareholders complain that the proxy statement omitted key details about other shoppers interested in buying Xura. *Id.* ¶ 117. They say the CEO made it impossible for one shopper to bid on the company. Not so. The shopper dropped out only because it could not match the Fund's better offer. *Id.* ¶ 117. Assuming otherwise does not help the shareholders. Even if the CEO had rigged the competition, they fail to tie that omission to a statement in the proxy. So this attack fails.

Finally, the shareholders point to the proxy statement's report that Xura had contacted twenty-six potential buyers. Second Am. Compl. ¶ 118. Not one, said the proxy

6

statement, made an offer. *Id.* That was misleading, the shareholders say, because one shopper *did* show interest. *Id.* ¶¶ 118–19. But mere interest is not an offer. Plus, the proxy's statement about the twenty-six buyers limited itself to a late stage of the sale. *Id.* ¶ 118. Yet the undisclosed shopper had shown interest at an earlier stage of the deal. Since the statement properly qualified itself, it could not be misleading.

\* \* \* \* \*

Shareholders say that Xura's CEO misbehaved. Taking the complaint as true, he very well might have. But the shareholders do not sue him for breaching his fiduciary duty. Rather, they sue over a proxy statement that is neither false nor misleading. So their claims fail. And because they do, so do the claims against the CEO and the other managers.

The shareholders have now filed three complaints, all based on the same document. But that document, this Court has twice ruled, does not support their claims. It would be futile and inequitable to let them amend their complaint yet again. So I will dismiss these claims with prejudice.